**CIANBRO CORPORATION,**
**Plaintiff, Appellee,**

v.

**CURRAN–LAVOIE, INC., d/b/a**
**Kenneth E. Curran, Inc.,**
**Defendant, Appellant.**

**No. 86–1680.**

United States Court of Appeals,
First Circuit.

Argued Jan. 6, 1987.
Decided March 18, 1987.

Alexander J. Kalinski, Manchester, N.H., with whom Richard S. Emerson, Jr., Portland, Me., was on brief, for defendant, appellant.

George F. Burns, with whom W. John Amerling, John David Kennedy and Amerling & Burns, P.A., Portland, Me., were on brief, for plaintiff, appellee.

Before COFFIN, Circuit Judge, ALDRICH and ROSENN,* Senior Circuit Judges.

ROSENN, Senior Circuit Judge.

This highly fact intensive case arises out of a dispute over the sale of certain assets and road construction contracts by Curran-Lavoie, Inc. (Curran), a construction company, to Cianbro Corp. (Cianbro), in exchange for a $600,000 promissory note. The district court found that a settlement agreement between the parties resolved all prior disputes, so that Curran could no longer recover a sum of $18,855 it claimed Cianbro owed to it. The district court also found that Cianbro was entitled to "set-off" the disputed amount by withholding two payments due under the note now held by Kenneth E. Curran, Inc.[1] and that accordingly Cianbro was not in default on the note. We affirm.[2]

## I.

In 1978 Curran was actively engaged as a road construction contractor. It was experiencing certain difficulties, however, due primarily to its president's illness and the State of New Hampshire's decision to suspend contracted-for work on two major bridge projects in Keene, New Hampshire. As a result, representatives of Curran communicated with Cianbro for the purpose of selling inventory and equipment, and also

---

* Of the Third Circuit, sitting by designation.

1. Curran-Lavoie, Inc. and Kenneth E. Curran, Inc. merged on May 21, 1980. Kenneth E. Curran, Inc. became the successor corporation.

2. This proceeding originally began as two separate state court actions in two different states. Curran sued Cianbro in New Hampshire on the promissory note, and Cianbro sued Curran in Maine for breach of the original sales agreement. Both actions were removed by the respective defendants to the United States District Courts for the states in which they were commenced pursuant to 28 U.S.C. §§ 1441 and 1446, and over Curran's objection the United States District Court for the District of New Hampshire transferred Curran's suit to the District of Maine pursuant to 28 U.S.C. § 1404, where the two actions were consolidated pursuant to Fed. R.Civ.P. 42(a). The district courts exercised jurisdiction over the removed state actions pursuant to 28 U.S.C. § 1332 (diversity of citizenship) and the United States District Court for the District of Maine applied Maine law. This court has jurisdiction pursuant to 28 U.S.C. § 1291 (final judgment of the district court).

for the purpose of inducing Cianbro to complete several uncompleted contracts.

After a period of negotiation, the parties entered into a handwritten "Agreement for Sale" (the sales agreement) to take effect on September 1, 1978. The agreement provided, *inter alia*, that Curran would sell equipment and inventory, and assign four of its construction contracts, including the two Keene, New Hampshire projects, to Cianbro. In return, Cianbro agreed to pay Curran $600,000, to be evidenced by a promissory note. The note provided that Cianbro would pay Curran $600,000 plus 10% interest, payable monthly at a rate of $10,000 per month.

Because part of the sales agreement called for the assignment of the uncompleted construction contracts with the State of New Hampshire, State approval was required to substitute Cianbro as the contractor. New Hampshire refused to consent to the substitution of Cianbro for Curran on the contracts, however, and Cianbro therefore arranged to become a subcontractor. Accordingly, Curran remained as an intermediary to whom the State payments were made and Curran in turn transmitted the payments to Cianbro.

As a further complication, the State owed money to Curran for work Curran had performed prior to September 1, 1978 (the date the sales agreement became effective). At the August 1978 meeting at which the agreement of sale was prepared and signed, Curran and Cianbro were unable to determine the exact amount still owed to Curran by the State, and so they agreed to figure it out at a later meeting between their representatives. This meeting never took place. Further, Cianbro also recognized that Curran was entitled to damages from the State for extra work caused by the unwarranted shut-down of the Keene projects.[3] Cianbro agreed to compensate Curran for sums awarded by the State for these claims out of the checks forwarded by the State to Curran and transmitted by Curran to Cianbro.

In a letter dated November 8, 1978, Curran informed Cianbro that Cianbro owed it a total of $137,441.03, subject to later correction, both for work in progress on September 1 and for extra costs. Cianbro disagreed with the amount and in an effort to resolve the dispute the parties exchanged letters for eight months.

In April 1979, Curran received and endorsed over to Cianbro a check for $174,729.57 from the State for extra costs, including those incurred by Curran. On April 19, 1979, Cianbro's engineer wrote to Curran indicating that Curran was entitled to $9,300 for the rental of steel sheet piling and $1,555 for overhead during the shutdown. On June 7, 1979, Cianbro's chairman wrote Curran a letter agreeing that Curran was entitled to $8,000 for "Mobilization" on the Keene projects. The total of the three sums is $18,855, the amount at issue in Cianbro's action against Curran.

Representatives of Curran and Cianbro ultimately met on August 29, 1979. Curran claims that the meeting was conducted for the sole purpose of determining how much Cianbro owed to it for work in progress as of September 1, 1978, and that extra costs incurred by Curran prior to that time were neither discussed nor a part of their settlement agreement.[4] Cianbro, on the other hand, contends that the meeting was intended to resolve all disputed claims, and points to a letter sent by Curran the day before the meeting, which noted that the parties were "to meet tomorrow at Littleton to resolve all claims relative to the Sale of Curran-Lavoie, Inc. equipment and inventory, September 1, 1978." The settlement agreement reached on August 29 was

3. The State had suspended work for four months at the projects in Keene because of problems allegedly caused by Curran. Curran was later absolved of any wrongdoing.

4. The parties do not dispute the district court's holding that a compromise agreement such as the August 29 agreement is an enforceable contract. *Warner v. Rossignol,* 513 F.2d 678 (1st Cir.1975). The problem is the interpretation of that agreement, which the district court resolved in favor of Cianbro as settling Curran's claim for all amounts due for both the work in progress and the extra costs, and thus precluding Curran from seeking any additional compensation from Cianbro for those items.

drawn up by Curran, labeled "Final Estimate," and read:

"Final Estimates for Projects in Progress, Curran-Lavoie, Inc. Sale September 1, 1978 as invoiced November 8, 1978 — $137,441.03

At request of Tom Currier, Construction Engineer, extra costs experienced by Curran-Lavoie, Inc. because of the temporary work suspension order at Keene project, May 22, 1978, were separated from original billing to Cianbro Corporation February 15, 1979.

Less — 66,684.99*

Adjustment in accordance with information furnished by Cianbro Corporation letter dated June 7, 1979.

Less — 945.00

Adjustment per agreement reached at David Driscoll's office, Littleton, August 29, 1979

Less — 24,241.56

NET AMOUNT DUE CURRAN-LAVOIE, INC. — $ 45,569.48

\* indicates the total monies owed Curran-Lavoie, Inc. by State of New Hampshire for extra expenses incurred because of temporary work suspension at Keene May 22, 1978, adjusted to correct for costs in excess of estimates as at November 8, 1978 are $66,684.99 plus $1,684.66, or $68,369.65.

Note: The above invoice is complete and final, per agreement reached this date, subject to a final adjustment relative to the performance and payment bond premiums upon receipt of audited invoices from The Rowley Agency, Inc. It is anticipated that a substantial additional bond premium must be paid for Keene P–2962–F because of extra work items approved by the Department. Also, it is understood that a credit will be generated by audit of Wentworth-Rumney project because of direct payment of all structural steel by NCS. This subject will be reviewed and reported to Cianbro as soon as available after acceptance and approval by the State of New Hampshire.

(Emphasis added).

Curran states that the starting figure of $137,441.03 represents what Curran claimed was owed to it for both the work in progress and the extra costs, including the $18,855 Cianbro had acknowledged was due Curran and which Cianbro had received.

Subtracted from that was $66,684.99, which Curran states is the amount it had previously claimed represented the extra costs, including the $18,855. Finally, Curran states that the balance was adjusted by agreement, part of which represented the amount owed to it for construction work in progress on September 1, 1978. The agreement stated that Curran would seek compensation from the State for the extra costs, and Curran did so as part of an action filed December 12, 1980. In the meantime, Cianbro paid the $45,569.48 balance representing the "Net Amount Due Curran-Lavoie, Inc." in the settlement agreement. Curran contends that this $45,569.48 figure did not include the $18,855 owed to it for extra costs, as that amount was included in the $66,684.99 deduction.

In November 1980, Curran received a check from the State in the amount of $23,617.19, which represented the State's final payment on the Keene projects. Curran's president then reviewed Curran's financial records, and determined that Cianbro had already been paid $18,855 in extra costs due and owing to Curran. Accordingly, Curran deposited the check, deducted $18,855 plus two other items and interest, and forwarded the $868 balance to Cianbro. Cianbro did not cash Curran's $868 check.

After many months of dispute, Cianbro withheld its July and August 1983 payments of $10,000 each, due Curran on Cianbro's original note. Cianbro did make its payment for that September, but failed to do so in October, November, or December of 1983. On September 23, 1983, Curran sent Cianbro a notice of default for the July and August payments. On November 4, 1983, Curran sent a letter of acceleration and demand for all payments due under the terms of the original promissory note. Finally, in January of 1984 Cianbro resumed making its monthly payments to Curran, and at some point paid the amounts due for October, November, and December of 1983. However, Cianbro never paid Curran the amounts due under the note for July and August of 1983.

## II.

A threshold issue raised in Curran's appeal is whether the District Court of New Hampshire erred in transferring Curran's New Hampshire lawsuit to Maine, and whether the district court in Maine erred in denying Curran's motion for a change of venue,[5] because of the asserted great expense and inconvenience of litigating in Maine a settlement agreement negotiated and entered into in New Hampshire, which involves New Hampshire contracts, inventory, and witnesses.

■■■ A decision of the district regarding a transfer of venue in a civil action may only be overturned for an abuse of discretion. *Eagle-Picher Indus. v. Liberty Mut. Ins. Co.*, 682 F.2d 12, 16 n. 1 (1st Cir. 1982), *cert. denied sub nom. Froude v. Eagle-Picher Indus.*, 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983). Factors to be considered by the district court in making its determination include the convenience of the parties and witnesses, the order in which jurisdiction was obtained by the district court, the availability of documents, and the possibilities of consolidation. *Codex v. Milgo Elec. Corp.*, 553 F.2d 735, 737 (1st Cir.), *cert. denied*, 434 U.S. 860, 98 S.Ct. 185, 54 L.Ed.2d 133 (1977); 28 U.S.C. § 1404(a). Where identical actions are proceeding concurrently in two federal courts, entailing duplicative litigation and a waste of judicial resources, the first filed action is generally preferred in a choice-of-venue decision. *Codex, supra.*

■■■ In the instant matter, the New Hampshire district court[6] found that "Cianbro's first-filed and first-removed Maine act[i]on should be given precedence as there do not appear to be any overriding considerations requiring retention of jurisdiction by this court." *Order* at 4 (citing *Codex supra* ). According to the district court, the time lag between the dispute and Cianbro's filing suit indicated that Cianbro

was not guilty of racing to the courthouse, whereas Curran's immediate action in New Hampshire indicated a "quick response to Cianbro's Maine suit, designed to get home-court advantage." *Id.* at 4–5. Further, the court found the convenience of the parties and witnesses to be inconclusive given the proximity of the federal districts and the parties' contradictory claims as to the residence of the majority of potential witnesses. Although the district court does not appear to have considered the location of the equipment and inventory, we regard these factors as irrelevant. Therefore, because we are persuaded by the New Hampshire district court's thorough analysis and because Curran has failed to demonstrate that any real inconvenience resulted from litigating in New Hampshire rather than the contiguous State of Maine, we conclude that there was no abuse of discretion in the New Hampshire and Maine district courts' decisions to have this litigation proceed in Maine rather than in New Hampshire.

## III.

■■■ We now turn to the principal issue raised by the defendant in its appeal, which is whether the August 29 settlement agreement included as part of the settlement the disputed $18,855. We agree with the district court's finding that the written settlement agreement was clear and unambiguous, and therefore conclude that it resolved the disputed amount.

Our conclusion in this regard is supported by several considerations. For example, the amount deducted as owed to Curran by the State for extra costs is specifically identified in the agreement as "*the total monies owed Curran-Lavoie, Inc.* by the State of New Hampshire for extra expenses incurred because of temporary work suspension at Keene...." (emphasis added). Further, following the above-quoted definition of the $66,684.99 deduction,

---

**5.** 28 U.S.C. § 1404(a) provides:
For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

**6.** The decision of the Maine district court is not reflected in the record beyond a reference in a "Report of Conference of Counsel" of October 5, 1984.

there is a "Note" which provides that "[t]he above invoice is complete and final." Although the agreement contained a reservation of rights to adjust for performance bond premium payments, no such reservation was made with respect to the $18,855. Moreover, Kenneth Curran's own testimony, as well as his letter to Cianbro of August 7, 1979, demonstrate that he intended the August 29 meeting to resolve all controversies between Cianbro and Curran.[7] Therefore, the evidence amply supports the trial court's finding that the August 29 settlement agreement was intended, at least by Cianbro, to resolve all disputes between the parties.[8] Even if the agreement were less clear, however, the district court would be entitled to construe this contract against Curran, as it was Curran who drafted the agreement. *See Chelsea Indus. v. Accuray Leasing Corp.*, 699 F.2d 58, 61 (1st Cir.1983) ("in case of doubt, an instrument is to be taken against the party that drew it"); Restatement (Second) of Contracts § 206 (1981) ("that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds").

### IV.

Curran asserts that the documents and letters considered by the district court in finding the settlement agreement to be clear and unambiguous set forth only a part of the negotiations between Curran

and Cianbro, and that the district court committed reversible error in refusing to admit nine letters and some of Kenneth Curran's testimony into evidence. The evidence was intended to show the subject matter of the August 29 meeting, the circumstances of the negotiations, and the parties' intentions. The first four exhibits consisted of letters dated August 31, 1978, February 15, 1979, April 19, 1979, and August 28, 1979, and the last five exhibits consisted of letters dated March 3, 1981, March 11, 1981, March 20, 1981, May 7, 1981, and June 2, 1981. Of the last five letters, three were written by Kenneth Curran and two were written by Cianbro representatives.

■ Given our conclusion in the previous section, the defendant's first four exhibits were all clearly excludable under the parol evidence rule. This rule operates to exclude from judicial consideration extrinsic evidence of any prior or contemporaneous agreements offered to alter or vary unambiguous contractual language. *See Zugelter v. Bank of Am. Nat. Trust & Sav.*, 728 F.2d 218, 220, 221 (3d Cir.1984); *Astor v. Boulos Co.*, 451 A.2d 903, 905 (Me.1982). Therefore, because the settlement agreement was unambiguous, and the letters offered all pre-dated that agreement, the district court did not err to the extent it refused to admit into evidence any of the foregoing letters.[9]

---

**7.** Although strictly speaking Curran's testimony and letter would have been inadmissible under the parol evidence rule, Cianbro raised no objection when either was offered. Therefore, although we do not base our conclusion on this evidence, we offer it as a matter of anecdotal interest.

**8.** The district court noted by way of a footnote that Curran's argument could conceivably be construed as a claim of mutual mistake justifying rescission or reformation rather than damages on the contract, but that "Curran does not dispute the validity of the agreement." Slip op. at 8 n. 5. Curran continues to contend that the settlement agreement was valid, and therefore, as did the district court, we decline to consider, *sua sponte*, the possibility of a mutual mistake.

**9.** The district court excluded defendant's exhibit 1 as cumulative and as demonstrating only the undisputed facts of Quentin Lavoie's illness and

the necessity of state approval of the assignment of the contracts. Defendant's exhibits 2 and 3 were admitted for the limited purpose of clarifying the parties' states of mind on August 29, 1979. The basis for the exclusion of exhibit 4 is unclear; however, it would appear that exhibit 4 may have been excluded on the basis of the parol evidence rule, because it was ruled inadmissible immediately after Cianbro pointed out that the letter was dated the day before the meeting. Although we do not find any of the above bases for excluding the defendant's first four exhibits to have been incorrect, we prefer to base our holding on the parol evidence rule. *See J.E. Riley Investment Co. v. Commissioner*, 311 U.S. 55, 59, 61 S.Ct. 95, 97, 85 L.Ed. 36 (1940) (where the decision below is correct appellate court may affirm so long as district court's judgment was valid on any ground); *Roy v. City of Augusta, Maine*, 712 F.2d 1517, 1520 n. 3 (1st Cir.1983) (same). Although we recognize that the district court did consider parol evi-

The defendant's last five exhibits were all excluded on the grounds that they were irrelevant. Although it is not at all clear that these items were irrelevant, we believe that their exclusion was nonetheless justified both on the grounds that they were cumulative of information already before the court, and on the grounds that they were prepared long after the events in question. Further, because three of the letters were written by Kenneth Curran himself, they would have been of little help in determining what the representatives of Cianbro intended. Neither of the other two letters, both written by representatives of Cianbro, support Curran's position. Therefore, we conclude that these items also were not improperly excluded.

Finally, Curran asserts that the district court erred in sustaining objections to certain of Kenneth Curran's testimony. Although Curran does not specify which of the exclusions it considers problematic, we have reviewed the transcript and find that none of the trial court's rulings with respect to Curran's testimony constituted error. In each and every instance in which testimony was excluded, Curran was attempting to either explain the meaning of the settlement agreement, go into what facts were decided in an opinion of another court, or ascribe an interpretation of the settlement agreement to Cianbro representatives. Any attempt to explain the settlement agreement was properly excluded on the ground that the agreement "spoke for itself." Kenneth Curran's attempt to go into the facts underlying another court's decision in Curran's suit against New Hampshire was properly excluded as both speculative and a waste of time, and his attempt to testify as to what Cianbro representatives understood the unambiguous agreement to be was properly excluded as irrelevant. Therefore, as with its rulings on the documentary evidence, the district court did not err in its rulings with respect to Curran's testimony.

## V.

Another issue urged by Curran is whether Cianbro was entitled to "set-off"

the disputed amount by withholding two payments due under the note now held by Kenneth Curran, Inc. The district court determined that the September 1, 1978, sales agreement was covered by Article 2 of Maine's Uniform Commercial Code, and that because Curran wrongfully withheld the $18,855 from Cianbro, the set-off was appropriate under Me.Rev.Stat.Ann. tit. 11, § 2–717. This section provides that a buyer "may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract." Me.Rev.Stat. Ann. tit. 11, § 2–717.

### A.

Under Me.Rev.Stat.Ann. tit. 11, § 2–102, Article 2 applies to transactions in goods, and "goods" are defined in Me.Rev.Stat. Ann. tit. 11, § 2–105 as "all things ... which are movable at the time of identification to the contract for sale...." The district court found that because approximately 98% of the total purchase price was for inventory and equipment, the sales agreement "was primarily one for the sale of goods, subject to Article 2." Contracts which deal primarily with the sale of goods are subject to Article 2 in their entirety. See Bonebrake v. Cox, 499 F.2d 951, 959–60 (8th Cir.1974) (contract for sale of goods including substantial amounts of labor covered by Article 2); Management Assistance, Inc. v. Computer Dimensions, Inc., 546 F.Supp. 666, 676 (N.D.Ga.1982), aff'd, 747 F.2d 708 (11th Cir.1984) (U.C.C. applicable to contract involving services and release of defendant from certain claims, in addition to sale of goods). See also Lincoln Pulp & Paper Co. v. Dravo Corp., 436 F.Supp. 262, 275–76 (D.Me.1977) (noting that Article 2 covers contracts dealing primarily with the sale of goods, but finding contract in question dealt primarily with the rendition of services). Curran contends that the above-cited cases are factually distinguishable from the case at bar in that they involved closer connections between the sales of goods and the other

dence offered by the plaintiff, none of the parol evidence was objected to by the defendant.

parts of the contract, and that these cases are therefore inapposite. We disagree.

In *Bonebrake, supra,* the court stated that the test for inclusion or exclusion from Article 2 is not whether the goods and non-goods parts of the contract are mixed, but rather, "whether their predominant factor, their thrust, their purpose, reasonably stated ... is a transaction of sale...." *Id.* at 960. In the case of the contract now before us, most of the significant terms and almost all of the purchase price related to the sale of goods. The first item in the contract listed both equipment and inventory valued at $590,000, plus $10,000 for covenants not to compete. The second item listed was a 3 year employment contract at $20,000 per year, and the third involved a $6,000 per year lease. Item four again dealt with assets, item five was a form of covenant not to compete, and item six dealt with the note and guarantee to be used to evidence the purchase price of the inventory and equipment. Finally, the seventh item stated simply, "[c]onstruction contracts to be assigned by Curran-Lavoie, Inc. to Cianbro Corporation and to be completed by Cianbro." In view of the obvious predominance of those portions of the agreement dealing with the sale of goods, we conclude that the district court did not err in its conclusion that this contract primarily concerned a sale of goods and therefore came within Article 2 of the Uniform Commercial Code. *See Dehahn v. Innes,* 356 A.2d 711, 718 (Me.1976) (contract was predominantly for the sale of goods and therefore within Article 2 where real estate represented only about 5% of the total price agreed upon).

### B.

We similarly reject any suggestion that the note and agreement to sell inventory and equipment is a separate agreement from the agreement to transfer the bridge construction contracts. Both the sale of inventory and equipment and the transfer of the construction contracts are provisions of the sales agreement. The promissory note, dated the same day as the sales agreement, states that it is given pursuant to those provisions. Further, the note is for the entire amount of principal provided for in the sales agreement, including the assignment provision, and the amount of principal and interest can be determined only by reference to the sales agreement. Although it is true that the sales agreement did not specifically contemplate that Curran would endorse state payments over to Cianbro, it did provide that the New Hampshire contracts would be assigned to Cianbro. The endorsement of the State payments was merely the procedure utilized by the parties as a result of the refusal of the State to consent to the substitution of Cianbro for Curran on the contracts. Therefore, we conclude that the district court did not err in finding that "the agreement to assign the contracts, through a subcontractor arrangement, and the promissory note were part and parcel of the same transaction."

### C.

 Finally, Curran argues that even if set-off of the July and August payments was proper, Cianbro's late payment of the October, November, and December payments gave rise to an action for the recovery of interest and costs of collection under the terms of the note. Curran's original complaint, however, failed to provide Cianbro with any notice that Curran intended to seek interest and costs on the late payments. Rather, the complaint incorporates two letters Curran sent to Cianbro, one dated September 23, 1983, and the other dated November 4, 1983, neither of which refer to anything other than the two $10,000 payments which we have already concluded were validly set-off. Therefore, because of Curran's inadequate notice, we conclude that Curran cannot now recover interest and costs of collection for these alleged defaults.

### VI.

We conclude that the district court did not err in finding that the settlement agreement included a disposition of the disputed $18,855, in holding that Cianbro was entitled to set-off the disputed amount

from its obligations under the promissory note, or in ruling on various evidentiary matters. We similarly conclude that there was no error in the New Hampshire and Maine district courts' decisions to fix the venue for this action in Maine.

*Accordingly, the judgment of the district court is affirmed.*