915 F.2d 1556
 Unpublished Disposition
NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
Reynold L. HOOVER, Plaintiff, Appellant,
v.
OSLEY & WHITNEY, INC., Defendant, Appellee.
Reynold L. HOOVER, et al., Plaintiffs, Appellants,
v.
OSLEY & WHITNEY, INC., Defendant, Appellee.
 Nos. 89-1673, 89-1725.
 United States Court of Appeals, First Circuit.
 July 19, 1990.
 
 Appeals From The United States District Court For The District of Massachusetts Michael A. Ponsor, United States Magistrate Judge.
 Stewart T. Graham, Jr., for appellants.
 Mark E. Draper, with whom Ryan & White, P.C., was on brief, for appellee.
 D.Mass.
 AFFIRMED.
 Before TORRUELLA, ALDRICH and CYR, Circuit Judges.
 AMENDED OPINION
 TORRUELLA, Circuit Judge.
 
 
 1
 Appellants, Reynold L. Hoover, his wife, Sandra J. Brandt Hoover ("Hoover"), and their unincorporated association, Sandrill Company, brought a diversity suit against appellee Osley and Whitney, Inc. ("Osley"), alleging breach of contract, breach of the implied warranty of merchant-ability and fitness, and violations under the Massachusetts General Law, chapter 93A (regulation of business practices for consumer protection, specifically unfair practices). Upon consent of the parties, the case was conducted by a United States Magistrate, who found that Osley complied with the terms of the agreement, and had not violated any warranties. 28 U.S.C. 636(c) The judgment entered in favor of Osley is now on appeal.[1] We affirm.
 
 FACTS
 
 2
 In the 1980's appellants Reynold and Sandra Hoover began discussing the notion of designing, manufacturing and distributing an inexpensive protective covering for the heels of women's high heel shoes. With this goal in mind, they started the Sandrill Company and in 1983 contacted Osley, a manufacturer of molds. On November 16th of that year, the Hoovers met with Roger Beauregard, Executive Vice-President of Osley, and Chester Jablonski, Osley's service manager, to discuss the project. Reynold Hoover, although a well qualified and seasoned engineer, was a novice in the area of molds, and particularly the concept of injection molding. Hoover understood the concept of injection molding but not the mechanics of it. By contrast, Beauregard had almost thirty years and Jablonski had thirty five years of experience in designing molds.
 
 
 3
 During this meeting, the parties discussed the nature of injection molding, the design of the machine, and the material required to meet Hoover's needs. The parties also discussed the possibility of an adhesion problem, which could result in the product sticking and being turned inside out, as well as other options of production. Although elements of the contract were discussed, a final price was never agreed upon and production of the mold was subject to the receipt of a price quotation.
 
 
 4
 This quotation was sent by Osley to appellants on November 23, 1983. This document contained the price and the description of the mold, and the work to be done by the defendants. The quotation also contained a caveat providing that the product might turn inside out upon ejection. Warranty and damage limitation provisions were printed on the reverse side. About a quarter of an inch over the signature line a notice stated "SUBJECT TO TERMS AND CONDITIONS OF SALE PRINTED ON REVERSE SIDE."
 
 
 5
 On December 15, 1983, Hoover met with Beauregard, accepted the terms of the quotation and tendered the one-third down payment required. He also provided a shoe, the heel of which was a model for the heel hugger. Appellees then proceeded to draft blueprints for the mold. In January of 1984, the parties met in the Osley plant, where the progress of the manufacture and the molding process was discussed.
 
 
 6
 In March 1984, after the defendant indicated that the mold was complete, all parties met and examined the parts produced by the mold. While the heel hugger ejected cleanly from the mold, the hugger did not fit on the shoe heel. The problem resulted from a dimensional error in the Osley blueprints. This delay caused Osley to miss the first promised date of delivery.
 
 
 7
 Without objections from Hoover, Osley then proceeded to make some of the necessary modifications. In April 1984, the parties met again to review the modified product. A test run was made, again plaintiff was not satisfied, and the second promised date of delivery, April 27, 1984, was not met. In a letter dated May 7, 1984, the Hoovers complained to Osley about the delay in the delivery of the mold. This letter contains no reference to sticking or lack of ejection of the product.
 
 
 8
 On May 11, Osley responded that the modifications had been made, and on May 29, 1984, a run of the mold with all modifications was performed. Hoover agreed that the product fit the heel properly. They allege, however, that the part produced by the mold was crumpled, and deformed, therefore it did not eject automatically, rendering the part unusable. Osley contends that the part produced on this run was precisely what the Hoovers had requested, as far as style and shape was concerned. It alleges that automatic ejection of the product was never agreed upon.
 
 
 9
 Pursuant to the agreement between the parties, after the molds had been completed, as demonstrated on the May 29th run, final payment was requested by Osley. Also included in this payment request was an amount for the additional modifications. On July 8, 1984, the Hoovers sent Osley a letter objecting to the amount requested and suggesting the production of other protection devices or molds. On July 19, 1984, Hoover paid the third installment in full. On August 15, 1984, Osley sent Hoover a letter indicating its justification for the cost and also indicating that they wished to continue working on the mold. It continued to do so until July 1988.
 
 
 10
 The controversy which led to the filing of the complaint hinges on the issue of automatic ejection. Essentially, appellants argue that the mold's failure to automatically eject the product requires hand-stripping the hugger from the mold and that this was not what they had bargained for. As such, the part could not be efficiently produced, thus could not be competitively priced. Hence, by not producing a mold pursuant to the terms of the November 16 oral agreement--an automatically-ejected, cost-efficient heel hugger--Osley breached the contract as well as all the applicable warranties.
 
 
 11
 On appeal there are two basic issues. First, we will determine whether the magistrate erred in not applying the Uniform Commercial Code ("UCC") and whether the result reached by the magistrate would be affected. Second, if the UCC does apply, we will determine whether the contract between the parties, or the warranties, were breached. This will require us to determine the nature of the contract, the warranties and the acceptance or rejection of the mold.
 
 STANDARDS OF REVIEW
 
 12
 On appeal the interpretation of a contract is a mixed question of law and fact. United States v. City of Twin Falls, 806 F.2d 862, 869 (9th Cir.1986); see Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1083 (1st Cir.1989). A contractual provision within the four corners of a contract is reviewed de novo. See Boston Edison Co. v. F.E.R.C., 856 F.2d 361, 365 (1st Cir.1988). In other contractual matters, however, such as when a provision within the contract is ambiguous, or when a contract is part oral and part written, the lower court's findings are treated as factual. See Fashion House, Inc. v. K Mart Corp., 892 F.2d at 1083; Sawyer v. Arum, 690 F.2d 590, 592 (6th Cir.1982).
 
 
 13
 In the instant case, the distinction between law and fact is of particular relevance because appellants claim the contractual relationship between the parties is based on an oral agreement. In an alleged oral contract, the parties intent is critical, see Fashion House, Inc. v. K Mart Corp., 892 F.2d at 1083, and trial courts or magistrates are not only entitled, but required to make factual findings and to assess credibility, to determine the parties' actual intent. See Sawyer v. Arum, 690 F.2d 590, 592 (6th Cir.1982). It is well settled law that a trial court's factual finding, when supported by the record, should not be disturbed on appeal unless clearly erroneous. Fed.R.Civ.P. 52(a). Moreover, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. Bessemer City, 470 U.S. 564, 574 (1985).
 
 
 14
 The determination of whether the magistrate erred by not applying the UCC will be treated as a question of law, and as such is subject to de novo review. This review, however, is not "an original appraisal of all the evidence," Bose Corp. v. Consumer Union of the United States, 466 U.S. 485, 514, n. 31 (1984), and it does not mean that, on appeal, this court is licensed to venture freely into other issues of fact or into the case as a whole. Id.
 
 
 15
 In the instant appeal, the magistrate's conclusions of law are closely intermingled with findings of fact. Thus, absent clear error, we will examine each one of appellants' contentions about errors of law in light of the magistrate's factual findings.
 
 DISCUSSION
 
 16
 Appellants contend that the magistrate erred in ruling that the contract between Hoover and Osley was not for the sale of goods within the scope of the UCC as adopted by the Commonwealth of Massachusetts. The magistrate did not respond to this argument when it was raised below. Instead it stated, by way of a footnote, that there was no need to express an opinion on this matter and that "... it was sufficient to say that plaintiffs/appellants had an uphill battle, legally as well as factually." Hoover alleges this was an error of law and as such we will review it.
 
 
 17
 To determine if a contract falls within the UCC, specifically Article 2, requires us to look into the nature of the contract and the type of goods at issue. Mass.Gen.L. ch. 106, Sec. 2-200 et seq. In the instant case, the parties contracted for the design services, as well as production of a mold. Upon review we find that the "predominant factor" of the contract was clearly the production of a mold. Cianbro Corp. v. Lavoie, Inc., 814 F.2d 7, 13 (1st Cir.1987) (quoting Bonebrake v. Cox, 499 F.2d 951, 959-60 (8th Cir.1974)). Hence, even if we find that the mold is a "good" for UCC purposes,[2] and thus that we agree with appellants that the contract may be enforceable under the UCC, we must determine whether application of the UCC affects the magistrate's conclusion.
 
 I. The contract
 
 18
 The Hoovers claim that the parties effectuated a binding oral contract on November 16, 1983, when they agreed to all the specifics of the contract except the price. They argue that under Article 2 of the UCC this constitutes a contract for sale even though the price had not been settled. Mass.Gen.Laws Ann. ch. 106, Sec. 2-305 (West 1990). The Hoovers further argue that the contract required Osley to produce a mold that automatically ejected the heel hugger, and thus, that the need to hand-strip constitutes a breach of contract. The magistrate determined that the November meeting did not result in an oral contract. It determined that during this meeting, Beauregard and Hoover tentatively agreed on the specifics of a potential contract. Hoover's own testimony revealed that the November 16th meeting was an exploratory meeting, and that neither party was obligated until after the receipt of the quotation. Moreover, it found that automatic ejection was never agreed upon.
 
 
 19
 Section 2-305 of the UCC does in fact allow the parties to conclude a contract for sale without a settled price. Section 2-204(3)[3] states, however, that when a term is left open, the intent of the contracting parties becomes particularly relevant to conclude the existence of a final binding contract. Mass.Gen.Laws Ann. ch. 106, Sec. 2-204 (West 1990).
 
 
 20
 The magistrate determined that during the November 16th meeting the parties had no intent to form a binding agreement. Applying traditional contract principles, the magistrate specifically found that the parties' conduct did not demonstrate this intent. This conclusion is based on testimony about the matters discussed at the meeting and on the fact that the actual production of the mold was subject to the receipt and the acceptance of the price quotation.
 
 
 21
 Rule 61 provides that an error is deemed harmless when it does not affect the substantial rights of the parties. Fed.R.Civ.P. 61. Although the magistrate may have erred in not applying the UCC, after examining the applicable provisions, we consider this error harmless and agree with the result reached. The record supports the findings of fact, and the analysis applied by the magistrate is consistent with the applicable UCC provisions.
 
 
 22
 II. Implied warranties and limitation of liabilities
 
 
 23
 Appellants next contend that Osley failed to plead affirmatively any limitation of liability or disclaimer of warranties. They further argue that, even if this is not so, these provisions, as included in the quotation, are ineffective because they are not conspicuous and do not comply with UCC requirements. The magistrate failed to address this issue under the UCC.
 
 
 24
 The UCC requires that provisions for the exclusion or modification of warranties be both in writing and conspicuous. Mass.Gen.Laws Ann. ch. 106, Secs. 1-201(10) 2-314, 2-315, 2-316(2) (West 1990). The test is whether attention can reasonably be expected to be called to the disclaimers. Mass.Gen.Laws Ann. ch. 106, Sec. 1-201(10) (West 1990). In Roto Lith v. F.P. Bartlett Co., 297 F.2d 497 (1st Cir.1962), this court found that a bold type notice on the front of a document, which stated that the agreement was subject to terms on the reverse side or the back of the document, was sufficient to provide adequate notice pursuant to the UCC. See also Hunt v. Perkins Machinery Co., Inc., 352 Mass. 535 (1967) (distinguishing Roto Lith because the disclaimer in question did not contain the "reverse side" specification).
 
 
 25
 After examining the quotation in question, we find that the disclaimer appears in bold type letters, in the front side of the document, about a quarter inch from the place provided for signature, and it expressly states: "SUBJECT TO TERMS AND CONDITIONS OF SALE PRINTED ON REVERSE SIDE." Clearly, attention is reasonably drawn to the reverse side of the document. Although the magistrate failed to address this issue specifically, if error, again it must be deemed harmless. If we examine the record in light of UCC requirements, the result reached would have been the same.
 
 A. Breach of warranty
 
 26
 Appellants' breach of warranty claim hinges on the "automatic ejection" issue. They aver that Osley breached the implied warranty of merchantability and the express and implied warranties of fitness for a particular purpose under both the UCC and Mass.Gen.Law ch. 93A.
 
 
 27
 The magistrate found that Osley had never guaranteed Hoover, orally or in writing, that the mold would eject the product automatically. To reach this conclusion the magistrate made reference to the fact that in the price quotation Osley pointed out that the product could stick and thus turn inside out, causing some problems. Sticking is the reason hand-stripping is required. It also took into consideration the fact that there was testimony that even during the November 16th meeting, Osley had forewarned the Hoovers about the adhesion of the material to the mold. Finally, it found that according to the usage of the industry, it was not unusual to hand-strip similarly manufactured items. Hence, the magistrate specifically concluded that the mold produced by Osley contained no defects violating any warranties, and that Hoover had failed, as a factual matter, to prove a breach of warranty of merchantability and a breach of warranty of fitness for a particular purpose.
 
 
 28
 In order to prove a breach of warranty of merchantability, the movant must prove that the goods which are the subject of a transaction would not pass without objection in the trade under the contract description. Mass.Gen.Laws Ann. ch. 106, Sec. 2-314(2)(a) (West 1990); McCabe v. Ligget Drug, Inc., 330 Mass. 177 (1953). Furthermore, in a breach of warranty of fitness for a particular purpose, the seller must have reason to know any particular purpose for which the goods are required. Mass.Gen.Laws Ann. ch. 106, Sec. 2-315 (West 1990).
 
 
 29
 The official notes to the applicable UCC regulations clearly state that whether or not this warranty arises in any individual case is basically a question of fact. Mass.Gen.Laws Ann. ch. 106, Sec. 2-315 (West 1990). Upon examination of the record we find that there is conflicting evidence. There is, however, sufficient evidence to support the magistrate's determination and to leave us with the firm conviction that the parties have been treated fairly. We find that the magistrate, without expressly applying the UCC, properly applied the law of the Code when it ruled that Osley had not breached the aforesaid warranties.
 
 
 30
 Finally, in prior decisions interpreting chapter 93A, this court has concluded that mere breaches of contract, without more, do not violate chapter 93A. See Chambers Steel Engraving Corp. v. Tambrands, 895 F.2d 858, 860 (1st Cir.1990) (quoting Pepsi Cola Metropolitan Bottling Co. v. Checkers, Inc., 754 F.2d 10, 18 (1st Cir.1985)). To this effect, the magistrate found no evidence demonstrating either that the mold was unusable or unmarketable. Finally, it concluded that there was no evidence that the two to three month delay caused plaintiffs any actual monetary damages. Although contradicted, the magistrate's choice is supported by the record, and therefore we agree with its conclusion.
 
 III. Acceptance
 
 31
 Appellants contend that the evidence clearly reveals they never accepted the mold,[4] that their dissatisfaction with the mold due to problems with adhesion and deformation of the product was apparent, continuous and adequately communicated to Osley, pursuant to Article 2 requirements. Mass.Gen.Laws Ann. ch. 106 Sec. 2-601(1); 2-605(1) (West 1990).[5] They further allege that the magistrate erred in using the fact that the Hoovers tendered full payment as evidence of acceptance.
 
 
 32
 After examining the evidence, the magistrate found various factors besides payment which lead to the conclusion that the Hoovers had accepted the mold. It found that trial testimony demonstrated that appellants were aware of the alleged deformation, but found no evidence of an intention to reject the mold. Moreover, the Hoovers had a reasonable opportunity to inspect the mold and, rather than rejecting it, stated they were not satisfied with it. Thereafter, Hoover made payment in full pursuant to the price quotation which specifically stated that this final payment was due upon acceptance of the mold. The UCC provides that,
 
 
 33
 (1) Acceptance of goods occurs when the buyer
 
 
 34
 (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or
 
 
 35
 (b) fails to make an effective rejection (subsection 2-602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them
 
 
 36
 .............................................................
 
 
 37
 ...................
 
 
 38
 * * *
 
 
 39
 Mass.Gen.Laws Ann. ch. 106, Sec. 2-606(1)(a), (b) (West 1990).
 
 
 40
 A payment made after tender, although not conclusive, is always a relevant factor to determine the acceptance, particularly in view of inconsistent actions. Mass.Gen.Laws Ann. ch. 106, Sec. 2-606(1)(a), (b) (West 1990). These provisions have been interpreted as establishing a presumption of acceptance, whereby failure to make an effective rejection after reasonable opportunity to inspect constitutes acceptance of the goods. See Connecticut Investment Casting Corp. v. Made Rite Co., Inc., 382 Mass. 603 (1981). Compare Ryerson & Sons, Inc. v. Commodity Engineering Corp., 689 F.2d 478 (4th Cir.1982). On appeal, we find that, notwithstanding any non-conformity, there is very little evidence on the record that shows an intention to reject. The record supports the magistrate's findings of fact, and even though it failed to apply the UCC, the magistrate's reasoning is consistent with its principles.
 
 
 41
 Next, Hoover argues that the magistrate erred in applying the substantial performance test, rather than the full performance test required by the perfect tender rule in section 2-601. This section provides that if the goods or the tender of the delivery fail in any respect to conform to the contract the buyer may reject or accept it. Mass.Gen.Laws Ann. ch. 106, Sec. 2-601 (West 1990). Pursuant to this section, appellants had a choice to reject the goods if these were not tendered as agreed upon. The magistrate found that appellants failed to reject, thus we need go no further.
 
 CONCLUSION
 
 42
 Traditional common law contract principles are the basis of the Uniform Commercial Code, however, this opinion does not intend to assimilate Article 2 to general contract principles, any more than the applicable legislation and case law has. In the instant case, we find that although the magistrate did not apply Article 2 of the Uniform Commercial Code, it relied on general contract principles not shown to be inconsistent with Article 2 and any resultant error was harmless. Since appellants were not prejudiced, the judgment is hereby
 
 
 43
 Affirmed. Costs to appellee.
 
 
 44
 .............................................................
 
 
 45
 ...................
 
 
 46
 * * *
 
 
 
 [1]
 The district court, entered judgment in favor of plaintiffs/appellants on their request for a declaratory judgment that they were not obligated to pay Osley for an additional $3,200 worth of modifications. The court found that the modifications were made pursuant to the terms of the original contract. This conclusion has not been appealed
 
 
 [2]
 The Code provides that "goods means all things which are moveable at the time of identification to the contract for sale...." Mass.Gen.Laws Ann. ch. 106, Sec. 2-105(1)
 
 
 [3]
 This subsection reads as follows:
 ... even though one or more terms are left open, a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.
 Mass.Gen.Laws Ann. ch. 106, Sec. 2-204 (West 1990).
 
 
 [4]
 The district court found that payment of the final third of the agreed upon amount constituted evidence of acceptance. It further considered a letter from Mrs. Hoover sent prior to the payment. In this letter, she questioned the amount charged for the additional work performed on the mold but made no other comments as to any dissatisfaction with the mold or any objection to accepting the mold or to making the final payment. The district court also took into consideration the witnesses' testimony
 
 
 [5]
 Section 2-601 reads in pertinent part:
 ... unless otherwise agreed under the sections on contractual limitation of remedy ..., if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may
 (a) reject the whole; or
 (b) accept the whole; or
 Section 2-605(1) reads:
 (1) The buyer's failure to state in connection with rejection a particular defect which is ascertainable by reasonable inspection precludes him from relying on the unstated defect to justify rejection or to establish breach....