FASHION HOUSE, INC.,
Plaintiff, Appellee,

v.

K MART CORPORATION,
Defendant, Appellant.

FASHION HOUSE, INC.,
Plaintiff, Appellant,

v.

K MART CORPORATION,
Defendant, Appellee.

Nos. 89–1330, 89–1331.

United States Court of Appeals,
First Circuit.

Heard July 31, 1989.

Decided Dec. 19, 1989.

Richard M. Sharfman, with whom Charles I. Poret, Daniel A. Ross, Sharfman, Shanman, Poret & Siviglia, P.C., New York City and Robert W. Lovegreen, Providence, R.I., were on brief, for Fashion House, Inc.

David M. Heilbron, with whom Leslie G. Landau, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., Steele, Goldman & Silcox, Robert W. Steele, J. David Gibbs and Cheryl M. Browning, Washington, D.C., were on brief, for K Mart Corp.

Before BOWNES and SELYA, Circuit Judges, and HARRINGTON *, District Judge.

SELYA, Circuit Judge.

In the mercantile world, turning a profit never goes out of fashion. So it was that, in June of 1983, K mart Corporation, defendant and counterclaimant, anticipating commercial advantage, joined forces with plaintiff Fashion House, Inc. (FHI). Expectancies notwithstanding, the road to increased revenues rarely does run smooth—and this proved to be an especially bumpy ride. *Cf. All About Eve* (Twentieth Century–Fox 1950) (statement delivered by Bette Davis). Well before the term of the parties' contract expired, they had moved from the fitting room to the courtroom.

The short of the matter is that FHI sued K mart (which it believed was concealing information); K mart attempted unilaterally to cancel the contract midstream; and FHI broadened and intensified its litigatory efforts. Plaintiff's expanded suit, filed in the United States District Court for the District of Rhode Island, claimed (1) that K mart had bypassed Fashion House in placing certain orders during the contract's currency, and thus owed FHI commissions referable to the merchandise; and (2) that FHI was also entitled to what it would have earned had K mart refrained from prematurely terminating the arrangement. Defendant denied any breach, blamed plaintiff for the parties' troubles, and asserted a bevy of counterclaims. The jury found K mart's excuses to be out of style and awarded damages in excess of $59,000,000. These appeals followed.[1]

Jurisdiction below was premised on diversity of citizenship and the existence of a controversy in the requisite amount. 28 U.S.C. § 1332. For the most part, with small exceptions as noted herein, the parties acknowledge that Michigan supplies the substantive law. We honor their agreement. *See Kali Seafood, Inc. v. Howe Corp.*, 887 F.2d 7, 8 (1st Cir.1989); *Moores v. Greenberg*, 834 F.2d 1105, 1107 n. 2 (1st Cir.1987). The assigned errors are many, and diverse. We begin with an overview of the parties' dealings and then address their contentions to the extent required, relating additional facts in connection with our discussion of particular issues.

## I. BACKGROUND

K mart is one of the nation's largest retailers, operating an extensive chain of discount stores. These emporia sell an assortment of items, clothing included. During the early 1980s, K mart was experiencing a decline in earnings. It entered into a flirtation with FHI, a young but highly successful jobber. On November 1, 1982, the parties agreed to live together on a trial basis. Under their written memorandum of understanding, FHI was to act as a buying agent for K mart. Evidently, both parties were pleased by the results of the

* Of the District of Massachusetts, sitting by designation.

1. K mart appealed from the verdict and the dismissal of its counterclaims. FHI filed a cross-appeal disputing the court's use of Rhode Island, rather than Michigan, law for the purpose of calculating prejudgment interest.

experiment: on June 30, 1983, during a ceremony marked by pomp and rosy prediction, they consummated the marriage, executing a long-term agreement (Agreement). We have excerpted the Agreement's key provisions in an attached appendix.

In general, subject to various conditions, exceptions, and qualifications, defendant agreed to purchase through plaintiff 85% of its overall requirements of "recognized designer and national brand name fashion and fashion-related apparel merchandise" and to award plaintiff a 5% commission on the net prices paid for the merchandise. The evidence is in sharp contradiction as to the net effect of what transpired after the Agreement solidified. FHI's view is that it performed its contractual obligations well and truly; that K mart prospered because of FHI's unstinting efforts; and that, even while enjoying fruits grown by FHI, K mart brought in great quantities of merchandise through the back door, as it were, depriving plaintiff of deserved commissions. K mart's story is radically different: it abided by the contract terms and gave plaintiff a fair accounting, and more—paying FHI over $32,000,000 in commissions; it received precious little in return, for plaintiff performed ineffectually, well below the level required by the Agreement.

On January 21, 1986, FHI wrote to K mart, articulating suspicions about K mart's commission accounting under the Agreement. Plaintiff demanded access to K mart's financial data for verification purposes. K mart denied that it owed additional commissions, but refused to open its books and records. Thereafter, K mart attempted to extricate itself from a souring relationship by setting FHI to a Sisyphean task: on February 6, it sent FHI a letter purporting to order a large but unspecified amount of apparel under particular brand names and labels then unavailable to FHI. The divorce came in April. Plaintiff broke the news that it had sued to obtain access to defendant's ledgers and to recover commissions earned but unpaid. K mart immediately terminated the Agreement (which at that juncture had over 18 months to run), claiming breach. From that moment on,

the protagonists have been at swords' point.

## II. THE PRECLUSORY ORDER
### A. *What Transpired.*

To put the trial record into proper context, we must first pass upon a pretrial ruling of considerable consequence. Through interrogatories, FHI sought to obtain, for relevant time periods, the dollar amount of K mart's purchases of apparel bearing any of 138 listed labels. Initially, defendant said that plaintiff could ascertain the requested information from documents to which access had already been provided. FHI tried. It learned—and K mart later admitted—that the data could not be gleaned from the indicated documents. Plaintiff then moved for, and was granted, an order compelling responsive answers to the interrogatories. This time around, K mart represented that its apparel purchase records were kept by manufacturer name, not label name; and that none of its employees were "able to provide the complete information sought in any of the Interrogatorie [sic]...." Defendant proffered a schedule indicating vendor sources for most of the requested label names, and dollar equivalents (presumably representing aggregate purchases) for some of them; subsequently, it supplemented the schedule by providing monetary amounts for 23 additional vendors. Once again, K mart's professed helpfulness was less real than apparent; it later admitted that all of these dollar figures related not to particular labels, but "only to total purchases from the vendors listed." Thus, the schedule, like what had gone before, was totally unresponsive, and misleading to boot.

FHI was exasperated by this cycle of apparent answers, followed by retractions, followed by more apparent answers (this time, in the face of a direct court order), followed by more retractions. It moved for sanctions, contending among other things (1) that K mart's officers had, at various times, publicly announced what percentages of K mart's apparel sales were brand name and designer label merchandise, thereby indicating that defendant had

greater knowledge of its labeled apparel purchases than disclosed in discovery; (2) that the evidence showed K mart to have purchased only labeled apparel from certain vendors, but even in those instances, dollar amounts had not been divulged; and (3) that when plaintiff sought discovery from one vendor to ascertain the dollar volume of K mart's purchases of labeled wares, K mart, in support of the vendor's motion to quash, provided an affidavit indicating (falsely) that it had already supplied FHI with the information. The motion was heard by a magistrate. At the hearing, K mart returned to its original position, viz., that the information sought could be obtained by rummaging through papers previously supplied. The magistrate was unimpressed. He determined, supportably in our view, that defendant's failure to furnish the information, despite a direct order of the court, "was intentional, deliberate and willful." The magistrate further found that "K mart did not act in good faith or in an honest and legitimate attempt to make discovery." Consequently, the magistrate ruled:

1. For the purposes of this action the apparel purchases by K mart ... upon which Fashion House was due a commission may be established by Fashion House by applying the percentages set forth in paragraph 2 below to K mart['s] ... total apparel purchases for the applicable time periods and calculating a commission of 5 percent upon 85 percent of such amounts.

2. [This paragraph of the order enumerated percentage figures derived from K mart officers' public statements, for relevant time periods.]

3. K mart is precluded from introducing evidence as to the amount of its direct purchases of any brand or label of apparel.

Defendant appealed the preclusory order to the district judge, who upheld the magistrate's findings and decreed that the first two paragraphs of the magistrate's order "shall stand as written *for the sole purpose of determining Fashion House's damages herein* with respect to purchases of apparel by K mart ... if Fashion House

is later held to be entitled to damages" (emphasis supplied). The judge modified paragraph 3 of the magistrate's order to the effect that K mart was to be "precluded from introducing evidence at trial which would have answered [the disputed interrogatories]." And, the judge took pains to write that the preclusory order's provisions would "not have any bearing upon any issue with respect to liability in this action...." Trial proceeded on this basis.

**B. *Discussion.***

■ Discovery sanctions "must be 'just'," and "specifically related to the particular 'claim' which was at issue in the order to provide discovery." *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 707, 102 S.Ct. 2099, 2107, 72 L.Ed.2d 492 (1982) (quoting Fed.R.Civ.P. 37(b)(2)). Absent an abuse of discretion, we will not disturb a district court's choice of sanctions. *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976); *Damiani v. Rhode Island Hospital,* 704 F.2d 12, 15–16 (1st Cir.1983). A party complaining to an appellate tribunal in such circumstances "bears a heavy burden of demonstrating that the trial judge was clearly not justified in entering [the] order." *Spiller v. U.S.V. Laboratories, Inc.,* 842 F.2d 535, 537 (1st Cir.1988); *see also Damiani,* 704 F.2d at 17 (cataloguing cases to show that abuse-of-discretion claims anent imposition of discovery-related sanctions "ha[ve] not received a sympathetic ear" on appeal). We do not believe that K mart has shouldered its burden or given us good reason to be receptive to its lamentations.

We have recently restated the test for abuse of discretion:

Abuse [of discretion] occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them.

*Independent Oil and Chemical Workers of Quincy, Inc. v. Procter & Gamble Mfg.*

*Co.,* 864 F.2d 927, 929 (1st Cir.1988). We have applied approximately this same formulation both to discovery orders, *see In re San Juan Dupont Plaza Hotel Fire Litigation,* 859 F.2d 1007, 1019 (1st Cir.1988), and to matters anent discovery misconduct, *see Anderson v. Cryovac, Inc.,* 862 F.2d 910, 923 (1st Cir.1988). Applying it here, we find no reason to believe that the district court, which obviously gave the matter deep and careful consideration before imposing so stern a remedy, overlooked any relevant factor, was influenced by any improper factor, or misgauged the weight of the pertinent factors.

The situation at bar is highly idiosyncratic. The parties' claims are, on some points, diametrically opposed. Yet, our canvass of the record substantiates that the court below, in the albedo of K mart's foot-dragging and flip-flopping, was justified in finding that the desired information was within defendant's ken and in concluding that defendant was intent on obstructing, rather than facilitating, the discovery process. That being so, the finding that K mart acted willfully and in bad faith was solidly grounded. And once such straitened circumstances develop, a trial court must be accorded wide latitude in choosing a condign sanction. *See Marquis Theatre Corp. v. Condado Mini Cinema,* 846 F.2d 86, 90 (1st Cir.1988); *Damiani,* 704 F.2d at 15.

District judges live in the trenches, where discovery battles are repeatedly fought. They are, by and large, in a far better position than appellate tribunals to determine the presence of misconduct and to prescribe concinnous remedies. Here, the disease was virulent and the medicine correspondingly strong. If trial courts are disabled from combatting serious, deliberate discovery abuses by measures which, albeit severe, reasonably fit the crime, then the inmates will be left in charge of the institution. The judiciary is not so impuissant. *See National Hockey League,* 427 U.S. at 642–43, 96 S.Ct. at 2780–81; *see also Damiani,* 704 F.2d at 15 (trial judge empowered to dismiss action where plain-

tiff repeatedly promised to comply with discovery requests and repeatedly broke the promises).

We need not paint the lily. Defendant's misdeeds touched upon the very issue addressed by the preclusory order. Considering K mart's gross misbehavior and the panoply of attendant circumstances, the lower court's order fell safely within the universe of suitable sanctions. *See Insurance Corp. of Ireland,* 456 U.S. at 707, 102 S.Ct. at 2106. There was no misuse of discretion.

## III. THE AGREEMENT

### A. *Terms of the Agreement.*

We turn next to the substance of this high-stakes contract dispute. In general, the Agreement obligated K mart to purchase 85% of its merchandise requirements through FHI. "Merchandise" and "Requirements" were contractually defined terms. Notwithstanding that the definitions appear in the Appendix, we repeat them here for ease in reference.

> [Section 2] "Merchandise" shall mean men's, women's, boys', girls', infants' and toddlers' recognized designer and national brand name fashion and fashion-related apparel merchandise; but not (a) products with names or labels owned or used by or licensed or exclusive to K mart or any of its Affiliates including products such as "Jonathan Logan" and "Esquire" and (b) products with names or labels originated by or for K mart or any of its Affiliates. The parties recognize that the definition of Merchandise is, of necessity, imprecise. *Therefore, as may be required from time to time, whether particular products are included in or excluded from the definition of Merchandise shall be determined by mutual agreement between Fashion House and K mart.*[2]
>
> \* \* \* \* \* \*
>
> [Section 3.1] "Requirements" shall mean Merchandise requirements for re-

---

**2.** We have supplied the emphasis. We sometimes call the underscored sentence the "agree-

ing-to-agree" proviso.

sale during the term of this Agreement in stores operated by K mart and its Subsidiaries in the United States, provided, however, that it shall not include (i) stores, departments or merchandise lines which are not within the current operations of K mart and its presently-existing Subsidiaries, (ii) "Wrangler" and "Sasson" products, and (iii) Merchandise for which orders or commitments were given by K mart or any of its Subsidiaries to third parties prior to the [effective] date [of the Agreement]. . . .

K mart's principal line of defense was built on these two definitions. Although conceding that it purchased labeled apparel without paying commissions to FHI, K mart contended that no commissions were owed: the apparel either was not "Merchandise" (because K mart had not agreed to include it as such) or was not part of "Requirements" (because it was purchased from third parties with whom K mart had dealt before FHI entered the picture).

The district court believed this defense was a sham. It ruled, first, that the agreeing-to-agree proviso did not apply to apparel at all. In the court's view, that language was intended only to furnish a vehicle for determining whether products apart from clothing—say, designer sunglasses, luggage, or jewelry—might be considered "fashion-related apparel merchandise" within the Agreement's ambit. As to the definition of "Requirements," the court construed the "prior orders" clause, § 3.1(iii), to relieve K mart from commission obligations only with respect to orders which were "in the pipeline" before the Agreement's effective date, that is, orders actually placed in advance of the K mart/FHI nuptials. Because plaintiff's commission claims related only to apparel orders submitted after the deal's inception, the court's construction effectively blunted both prongs of K mart's stated defense.

### B. *Applicable Law.*

■ Contract interpretation presents, in the first instance, a question of law, and is therefore the court's responsibility. *See, e.g., Boston Edison Co. v. FERC*, 856 F.2d 361, 365 (1st Cir.1988); *Craib v. Commit-*

*tee on Nat'l Missions*, 62 Mich.App. 617, 233 N.W.2d 674, 676 (1975). If, however, a contract is thought ambiguous, the court may receive extrinsic evidence, even parol evidence, to determine whether uncertainty exists. *See Sunstream Jet Express, Inc. v. International Air Service Co.*, 734 F.2d 1258, 1268 (7th Cir.1984). Contract language is usually considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken. *See In re Navigation Technology Corp.*, 880 F.2d 1491, 1495 (1st Cir.1989); *Petovello v. Murray*, 139 Mich.App. 639, 362 N.W.2d 857, 858 (1984). Determining whether or not a contract is ambiguous is, like other questions of contract construction, a matter for the court. *See Navigation Technology*, 880 F.2d at 1495; *Boston Edison*, 856 F.2d at 365; *Triple–A Baseball Club Assocs. v. Northeastern Baseball, Inc.*, 832 F.2d 214, 220 (1st Cir.1987), *cert. denied*, 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988); *see also Zinchook v. Turkewycz*, 128 Mich. App. 513, 340 N.W.2d 844, 848 (1983) (contract construction is ordinarily a question of law for the court); *cf. Craib*, 233 N.W.2d at 676 (where language used is incomplete or determined by the court to be ambiguous, or in unusual circumstances, the substance of the parties' agreement may become a fact question for the jury).

■ Here, the judge interpreted and applied the Agreement, determining that there were no ambiguities for the jury to resolve as to whether the parties intended particular wares to comprise "Merchandise" and/or "Requirements." Those were "legal" judgments and our review of them is, therefore, plenary. *Navigation Technology*, 880 F.2d at 1495; *Triple–A Baseball Club*, 832 F.2d at 220; *cf. Central Jersey Dodge Truck Center, Inc. v. Sightseer Corp.*, 608 F.2d 1106, 1110–12 (6th Cir.1979) (court of appeals uses de novo standard of review in resolving case under Michigan law).

### C. Application.

1. *"Apparel Merchandise:" The Rationale Below.* We start our interpretive odyssey with the district court's construction of section 2 of the Agreement, and the court's reasoning. The judge found it significant that, in the first sentence of section 2—the sentence containing adjectival descriptions relating to merchandise—the parties referred to "apparel merchandise" as a collective noun, whereas later in the same paragraph, they switched to the noun "products." He felt that this linguistic shift indicated that the source of the definitional uncertainty, the existence of which was acknowledged by the parties in the paragraph's second sentence ("the definition of Merchandise is, of necessity, imprecise"), did not lie in the descriptive characteristics of particular brand name items, but rather, in the substantive nature of the items themselves. Put another way, the court concluded that the parties did not regard their selected adjectives as leaving the feared imprecision, but saw the questionable area as whether or not given items could be considered "Merchandise" as opposed to "products," and the line of demarcation as apparel/non-apparel. Yet the fact remains the parties stipulated in their contract that, in certain contexts, particular items would have to be classified as "recognized," "designer," "national," and/or "fashion and fashion-related" to warrant inclusion as "Merchandise."

According to the district court's taxonomy, if an item came within the subset of "apparel," it would perforce fall within the larger set of "Merchandise" for purposes of the Agreement. On this theory, the question foreseen by the parties in the agreeing-to-agree proviso, *i.e.*, "whether particular products are included in or excluded from the definition of Merchandise," would need to be asked only if a "product" could plausibly be deemed a "non-apparel" item.

2. *A Preferable Construction.* We think that the lower court's focus was overly narrow. While contracting parties' choice of language is a strong indicia of their intent, *see Remes v. City of Holland,* 147 Mich.App. 550, 382 N.W.2d 819, 821 (1985), courts should be chary of leaning too heavily on hairline nuances. When the words the parties have selected possess a breadth enveloping myriad meanings, the judge need not rush to play the role of augur. In this situation, for example, the threshold question is less whether selection of the word "products" could possibly have been intended to distinguish apparel from non-apparel items, but more whether the usage, taken in context, sent unmistakably conflicting signals which required the court to fill the interpretive interstice. *See Central Jersey Dodge,* 608 F.2d at 1109; *DeVries v. Brydges,* 57 Mich.App. 36, 225 N.W.2d 195, 198 (1974). We believe it did not: fairly scanned, the Agreement admits of only one reasonable interpretation on this point—and that interpretation contradicts the district court's rendition.

Where possible, words should be given their natural meaning, consistent with the tenor of contractual terms. *Davis v. Kramer Bros. Freight Lines, Inc.,* 361 Mich. 371, 105 N.W.2d 29, 31 (1960). Black letter law teaches that "a construction which comports with the Agreement as a whole is to be preferred even if it be thought that certain language, viewed only by itself, more readily suggests something else." *Spartans Indus., Inc. v. John Pilling Shoe Co.,* 385 F.2d 495, 499 (1st Cir. 1967); *see also Geerdes v. St. Paul Fire and Marine Ins. Co.,* 128 Mich.App. 730, 341 N.W.2d 195, 197 (1983) (no word should be considered surplusage if it may serve a reasonable purpose). As we read the Agreement in its entirety, it seems readily to evince a mutual intent that items obviously apparel are to be included within the ambit of potential dispute governed by the agreeing-to-agree proviso. To construe it otherwise—as demonstrating an intention to exclude apparel entirely from the area of admitted imprecision—strikes us as much too strained. What is more, such an interpretation cannot easily be supported by either the document's letter or the parties' discernible intent.

The construction which we advance—that the agreeing-to-agree proviso is appli-

cable to apparel—not only flows naturally from the instrument, but is buttressed in several significant ways. For one thing, it is as consistent with the paragraph's shift in linguistic gears as any other construction. After all, the word "product" simply means "something produced." *See* Webster's Third New International Dictionary 1810 (1981). A piece of clothing is no less a product when its nomenclative fame is restricted to the village in which it is sewn than when its popularity girdles the globe. The point along that continuum at which the garment becomes a "national" brand name may very well be a matter of appreciable imprecision. And, the parties' use of the word "products" in clauses (a) and (b) of section 2 bears out this interpretation. Clearly, all items bearing "Jonathan Logan" and "Esquire" labels, not just those that are obviously something other than apparel, are excepted from the definition of "Merchandise."

For another thing, the parties, in their pre-suit dealings, did not act as if there was a worrisome ambiguity in regard to *kinds* of products (as opposed to product *attributes*). To the exact contrary, correspondence in evidence indicates that, after the Agreement was signed, FHI and K mart engaged in what amounted to a definitional dialogue regarding certain brand name items of apparel. More telling, perhaps, they eschewed all exploration of avenues for differentiating "apparel" from "non-apparel," notwithstanding that erecting such a divider seems a fairly simple definitional feat. In a nutshell, the record contains no support for the proposition that descriptive imprecisions pertaining to product attributes were beyond the contracting parties' contemplation.

■ We are quick to admit that, by stretching a bit, we can understand how the district judge arrived at a different interpretation, especially since K mart's trial counsel did not present their arguments as clearly as one might have wished. Nevertheless, lack of ambiguity is a relative status, not an absolute one. The parties need not choose phraseology which invariably excludes every possible interpretation other than the one which they intend. *See Triple-A Baseball Club*, 832 F.2d at 220. We think it is sufficient if the language employed is such that a reasonable person, reading the document as a whole and in realistic context, clearly points toward a readily ascertainable meaning. In this case, that benchmark was achieved.

3. *Plaintiff's Rejoinder.* Preveniently, as though anticipating that we might reach such a conclusion, plaintiff has a ready rebuttal. It urges that, aside from whatever can or cannot be gleaned from the parties' use of the word "products," the agreeing-to-agree proviso must still be interpreted to apply only to kind, not attributes, in order to give the Agreement some semblance of meaning. If nothing is a "Merchandise requirement[ ]" until K mart agrees it is "Merchandise," FHI reasons, then the first sentence of section 2, and the exceptions enumerated in section 3.1, are altogether hollow. It would be meaningless, plaintiff argues, contractually to define (generally or with specificity) which apparel items are or are not merchandise requirements if K mart can fabricate loopholes by the simple expedient of refusing to agree that merchandise is merchandise.

■ This asseveration depends upon the premise that, if the agreeing-to-agree proviso applies to items obviously apparel, then no such items are "Merchandise" unless and until K mart assents to their inclusion. But, the premise is flawed. The district court found, and K mart does not now dispute, that the contract was a requirements contract. As such, K mart had an enduring duty to determine the extent of its requirements in good faith. *See* Mich.Comp.Laws § 440.2306(1) (1967) ("A [contract] term which measures the quantity by . . . the requirements of the buyer means such actual . . . requirements as may occur in good faith") (codifying U.C.C. § 2–306(1)); *see also* Agreement § 3.1 ("The determination of Requirements shall be made by K mart in good faith."). Certainly, a blanket determination by K mart that all purchases for which it abjured commission payments were not "Merchandise requirements" would transgress this obli-

gation. *Compare, e.g., Empire Gas Corp. v. American Bakeries Co.*, 840 F.2d 1333, 1341 (7th Cir.1988) (determination of requirements based solely on unilateral reassessment of buyer's advantage/disadvantage balance was not made in good faith).

Indeed, interpreting the agreeing-to-agree proviso as encompassing apparel does not suffocate, but breathes life into, the specific exceptions noted in sections 2 and 3.1. Rather than being surplusage, as under the district court's reading, those sections would serve to exclude from a good-faith determination of "Merchandise requirements" items—presumably, apparel items—that might otherwise be subject to inclusion. Instead of being redundant, as the district court feared, the provisions would serve to explicate the required good faith. *See, e.g., id.* at 1341. Outside of the specifically mentioned brand name exclusions, the characteristics enumerated in sections 2 and 3.1, *e.g.*, "designer," "national," and "brand name," regain their relevance as foci of the definitional disputes foreseen by the parties.

We need add no further embroidery. In this instance, the agreeing-to-agree proviso extends to items obviously apparel. The district court's interpretation of section 2 was wrong.

■ *4. The "Brand Name" Exclusion.* The court's reading of section 3.1 does not suffer from the same strain of infirmity. It construed § 3.1(iii) to exclude from "Requirements" only in-the-pipeline orders, *i.e.*, those placed before the Agreement became effective. K mart exhorts that the parties intended clause (iii) to sweep more broadly and exclude future purchases of goods bearing brand name merchandise labels ordered by K mart at any time in the past. But, if this is so, the language chosen, *which makes no mention of labels or brand names*, is an extremely awkward locution, not fairly expressive of the intent which K mart, after the fact, assigns to it.

We are chary about crediting what seems to be an obvious *post hoc* rationalization. Certainly, K mart knew the brands it had previously ordered, and could have— as with "Wrangler" and "Sasson" products, *see* Agreement § 3.1(ii)—excluded them by name. That defendant took no such step is a reliable indication that, other than "Wrangler" and "Sasson," brands purchased in the past [3] were not meant to enjoy a blanket exclusion for purposes of calculating defendant's "Requirements." *Cf., e.g., Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1515 (1st Cir.1989) (inappropriate for court to imply contract provision when parties would naturally have been expected to include it, had that been their intention); *Allied Communications Corp. v. Continental Cellular Corp.*, 821 F.2d 69, 71 (1st Cir.1987) (similar); *In re Estate of Seitz*, 142 Mich.App. 39, 369 N.W.2d 258, 260 (1985) (similar), *rev'd on other grounds*, 426 Mich. 630, 397 N.W.2d 162 (1986).

■ K mart further complains that the trial court's interpretation of the requirements section makes no "logical business sense" because K mart would wind up paying commissions for items previously purchased commission-free. The remonstrance is true, but largely beside the point. While under Michigan law contracts ought not to be interpreted to impose absurd results, *see Port Huron Area School Dist. v. Port Huron Educ. Assoc.*, 120 Mich.App. 112, 327 N.W.2d 413, 415 (1982), the result reached here is neither chimerical nor illogical. The total picture may well eclipse any seeming inequity: K mart might have thought FHI was positioned to negotiate lower prices or more attractive terms (thus saving K mart money even after commission costs); or K mart may have believed that internal economies, *e.g.*, laying off buyers, would counterbalance commissions; or K mart may have been willing to accept an extra burden in order to obtain the perceived benefit of an across-the-board relationship with a well-credentialed jobber. In addition, it bears remembering that K

---

**3.** The parties dispute whether K mart ever purchased "Wrangler" products before teaming up

with FHI. We need not resolve the conflict.

mart reserved 15% of "Merchandise requirements" for itself, which it might have considered enough to cover all purchases of name brands to which it previously enjoyed access. We need not speculate. It is the very possibility that a buyer may be disadvantageously bound to a seller which supplies the consideration that makes requirements contracts enforceable. *See, e.g., Precision Rubber Products Corp. v. George McCarthy, Inc.,* 872 F.2d 187, 188 (6th Cir.1989); *McLouth Steel Corp. v. Jewell Coal & Coke Co.,* 570 F.2d 594, 605 (6th Cir.1978) (applying Michigan law). We agree with the district court's interpretation of section 3.1 of the Agreement and do not believe that such a reading produces an absurd result.

 5. *Taking Inventory.* We take stock of where this split decision leaves us. In our estimation, the lower court's use of an erroneous definition of "Merchandise" not only improperly colored the jury's determination of damages, but also influenced—indeed, effectively removed from the jury's province—a salient question of liability. Under the court's construction of the Agreement, no question could ever arise as to whether any apparel items were "Merchandise." At trial, therefore, evidentiary proffers in that vein were ruled irrelevant, and reflexively excluded. Combined with the sanction order and the fact that FHI's commission claims related exclusively to apparel, K mart was effectively blocked from offering evidence of apparel purchases from various vendors *on any issue.* As the court stated: "The amount of purchases by K mart from all of those different vendors is irrelevant on any issue, except damages, in this case." That pronouncement may have been so under the district court's construction of the Agreement; but, under a proper construction, the dollar amounts were plainly relevant to liability. We explain briefly.

The twin facts which the district court deemed determinative—that this was a requirements contract and that K mart purchased labeled apparel (aside from the 15% exclusion) without paying commissions—did not necessarily establish liability. If defendant could demonstrate that the difference between the dollar amount of all its labeled apparel purchases and the dollar amount of the purchases on which FHI was paid commissions consisted of labeled apparel purchases which were not "Merchandise requirements" within the Agreement's contemplation, or that any excess was within the 15% exclusion, defendant would not be liable for unpaid commissions.[4] The proof that some labeled apparel purchases were not includable in the category of "Merchandise requirements" would, to be relevant, necessarily include evidence of the dollar amount of those purchases. In that way, total exclusion of such evidence improperly removed a potential issue of liability from the jury's consideration.

In fine, the lower court's ban of dollar amount evidence for all purposes was reversible error. Concededly, the jury found K mart liable for commissions in addition to those calculated by using the preclusory order—but the talesmen's determination was tainted by the court's evidentiary rulings and instructions on liability. We see no alternative but to remand for a new trial to permit the questions of liability and damages to be ascertained in accordance with law. On retrial, should plaintiff establish K mart's liability for any unpaid commissions, then the percentages in the sanction order will be available to plaintiff as the measure of the minimum amount(s) owed in damages with respect to all items properly within the purview of sections 2 and 3 of the Agreement (including, without limiting the generality of the foregoing, items on which K mart refused to pay commissions by reason of a contention that the merchandise was of a brand previously purchased). Plaintiff remains free, of course, to offer proof of recoverable damages exceeding those ascertainable by reference to the preclusory order.

---

**4.** We do not suggest that this is or is not a likely scenario. We hold only that the district court's interpretive error, and the consequent exclusion of defendant's proffers, deprived K mart of the opportunity to disprove liability in this way.

## IV. THE COUNTERCLAIMS

### A. *Setting the Stage.*

Nothing daunted by FHI's complaint, K mart answered and served eight counterclaims against FHI and one of its principals, Jack Wasserman,[5] suggesting that plenary blame for the failed marriage reposed with FHI. One counterclaim was withdrawn during trial; two others were merged by the district court, without preserved objection on K mart's part. That left six counterclaims pending—and the district court granted instructed verdicts in FHI's favor on all of them. K mart appeals five of those rulings.

Because one particular transaction predominates in the litany of the counterclaims, we must widen our factual horizons in order to achieve proper perspective. In 1982, K mart opened a chain of "Designer Depot" (DD) stores. The venture was intended to cater to the tastes of upscale consumers by offering an assortment of clothes bearing highly desirable labels at competitive prices. FHI helped K mart launch the DD project and, in the fullness of time, provided most of the chain's merchandise. In early 1985, FHI purchased a significant quantity of Guess? jeans for its own account.[6] It subsequently resold about $431,000 worth of these jeans to DD.

Later that year, DD ran a back-to-school promotion and advertised the Guess? pants as women's jeans. In fact, they were men's jeans—and each pair bore a label to that effect. It turned out that FHI had obliterated the labels. Be that as it may, K mart was not ignorant of the true facts: the record strongly suggests that, at least as far back as March of 1985, a K mart buyer had noticed the altered tags while the jeans were still in an FHI warehouse. And, well before the back-to-school sale was organized, other K mart employees independently discovered the authentic "gender" of the pants. Still and all, K mart elected to promote and sell the jeans as women's wear.

Both K mart and FHI were later sued by Guess? in another federal district court for trademark infringement and kindred wrongs. Eventually, both defendants settled (FHI paid $1,000,000 and K mart paid $1,250,000)—but not before incurring hefty defense costs.

### B. *Standard of Review.*

▇▇▇ The standard of review is not in doubt. When directed verdicts have been granted, we must examine the evidence and the inferences reasonably extractable therefrom in the light most hospitable to the nonmovant. To affirm withdrawal of any claim from the jury, we must find that, so viewed, the evidence would permit thoughtful factfinders to reach but one reasoned conclusion. *See Wagenmann v. Adams,* 829 F.2d 196, 200 (1st Cir.1987). In performing this tamisage, an appellate court "may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." *Id.* Nevertheless, the evidence to which the nonmovant points must comprise more than fragmentary tendrils: a mere scintilla of evidence is not enough to forestall a directed verdict, especially on a claim or issue as to which the burden of proof belongs to the objecting party. *See Desfosses v. Wallace Energy, Inc.,* 836 F.2d 22, 30 (1st Cir.1987); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). With these tenets in mind, we address the counterclaims which are before us.

### C. *Breach of Contract.*

K mart's flagship counterclaim is a classic example of the pot calling the kettle

---

**5.** In actuality, defendant served a single counterclaim containing eight counts. For ease in reference, we treat the octonary pleading as if eight separate counterclaims were filed. Inasmuch as Wasserman's presence makes no difference for our purposes, we discuss the counterclaims solely in terms of FHI (although our adjudications apply equally to Wasserman *qua* counterdefendant).

**6.** FHI had learned its lesson when, on a previous occasion, it brought an analogous opportunity to K mart and thereafter lost not only its commission, but the chance to buy valuable merchandise, because of K mart's indecision and/or poor communications between the parties. This time, FHI decided, warrantably, to protect itself against conceivable hemming and hawing by dealing as a principal.

black. In it, defendant contended that FHI breached the Agreement by failing to supply (i) merchandise reasonably required, and/or (ii) merchandise purchased direct from manufacturers (as opposed to wares obtained via diverters or other middlemen). Although our reasoning differs in certain respects from the district court's, we affirm its direction of a verdict on this counterclaim. *See Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1349–50 (1st Cir.1988) (appellate court "not wed to a trial court's reasoning," but free to affirm on alternate grounds); *Polyplastics, Inc. v. Transconex, Inc.*, 827 F.2d 859, 860–61 (1st Cir.1987) (same).

Under section 1.1 of the Agreement, FHI was obligated to "acquire (or cause to be acquired)" only such "Merchandise" as K mart "ordered." The Agreement further provided that "Fashion House will acquire Merchandise ordered hereunder only pursuant to authorization from and on terms approved by K mart in writing...." *Id.* at § 4.1. Orders were to be placed and processed "based on samples ... or as otherwise mutually agreed between the parties, and within guidelines mutually agreed between the parties." *Id.*

In practice, a regular course of conduct soon developed. FHI would bring garment samples to K mart. Regardless of whether the samples came from manufacturers, diverters, or middlemen, K mart's buyers would inspect them and then determine whether to test the mercantile waters. If the decision was affirmative, K mart personnel would give FHI what amounted to an order, that is, particulars as to quantities, prices, sizes, and the like. It was only after K mart staffers set the specifications that FHI executed orders on K mart's behalf.

Based on this historical record, the district court determined that the Agreement required "very specific orders" from K mart before FHI could be expected to procure goods to K mart's behoof. We agree

entirely with this interpretation: an unbroken skein of custom and usage demonstrated beyond cavil that the parties had "mutually agreed" on the nature of the ordering process and their relative duties within that process. Once FHI secured samples, it was up to K mart to determine which merchandise would be ordered. And it was pellucid that only K mart could authorize a purchase under the Agreement.

■ Defendant's counterclaim did not implicate the buying agent's general level of compliance with this protocol. After all, the merchandise delivered was, by and large, the merchandise selected and ordered by K mart. With but one exception, K mart never ordered specific merchandise other than from the continuing array of samples which FHI submitted from time to time. Nor do K mart's conclusory allegations that plaintiff failed "to provide assistance and advice," *see* Agreement § 6.1, require a different result. There was simply no evidence that FHI ever refused to give assistance or advice when requested. The fact that such advice may appear in hindsight to have been incorrect is plainly irrelevant.

■ The counterclaim did address the lone exception to the purchase order protocol, asserting that FHI neglected a particular "order" which K mart submitted to it on February 6, 1986.[7] This missive informed FHI that K mart needed:

a significant number of dozens of the following merchandise in the best-selling assortments and sizes:

1. Levi Strauss Style 501 Men's and Boys' Jeans;

2. Lee Washed Jeans (Men's and Boys');

3. Arrow Dress Shirt—white and fancy broadcloth; and

4. Van Heusen Dress Shirt—white and fancy broadcloth.

A week later, FHI informed K mart that it could not fill this order because it request-

---

7. We alluded briefly to the February 6 order in setting out the background of the case. *See supra* Part I. The district court accurately determined that FHI's failure to acquire merchan-

dise under this order was "the only allegation in [the first counterclaim] which could possibly set up a breach of contract situation."

ed brand names and labels to which FHI had no access.

It seems clear to us that K mart's evidence on this counterclaim, taken in the light most flattering to its cause, was inadequate to forestall a directed verdict. The February 6 order was utterly devoid of the specific information required by the parties' mutual agreement, that is, by their custom, usage, and practice. There are no specifics as to sizes, prices, or colors. Instead, the entire order is hinged on vague generalities. FHI's refusal to process it was, therefore, not actionable. The law is not so fatuous as to hold an agent responsible to its principal for the latter's failure satisfactorily to articulate its wishes. *See Fort Pitt Malleable Iron Co. v. Detroit Steel Products Co.*, 260 Mich. 683, 245 N.W. 546, 547 (1932).

We add a small eschatocol. We share the trial court's evident suspicions that K mart, by the sudden injection of this quirky order at a point when the parties were girding for battle, was attempting to set an impossible task for FHI, and thereby improve its litigating position. Courts should not reward such stratagems. As we recently wrote: "A [claimant] cannot be permitted to induce damages and then recover for them." *Lopez Lopez v. Aran*, 890 F.2d 531, 534–35 (1st Cir.1989). Be that as it may, the circumstances at bar require us to look no further than the parameters of the arrangement which the parties, by past conduct, had clearly defined. K mart had a correlative duty to comply with the consensual guidelines it helped to set. It could not unilaterally change the rules as the ninth inning approached.

### D. *Breach of Fiduciary Duty.*

In its second counterclaim, K mart alleged breach of fiduciary duty, advancing a laundry list of particular grievances. Among other things, K mart contended that FHI (1) failed to acquire merchandise with particular brand names and labels; (2) was indifferent to whether merchandise would perform well in the marketplace; (3) overcharged K mart for services rendered; and (4) acted deplorably in connection with the Guess? transaction. Given defendant's proof (or more precisely, the lack thereof), the district court thought this claim insufficient to reach the jury. We agree.

Under Michigan law, "the agent's loyalty to the principal in the performance of the agency functions must be absolutely undivided." *Cozzens v. Bazzani Bldg. Co.*, 456 F.Supp. 192, 198 (E.D.Mich.1978); *see also Meirthew v. Last*, 376 Mich. 33, 135 N.W.2d 353, 355 (1965). But, no agency relationship exists in a vacuum. When, as here, such a relationship is limned by a written agreement negotiated at arms' length between sophisticated commercial entities, "[t]he existence and extent of the duties of the agent to the principal are determined by the terms of the agreement between the parties...." Restatement (Second) of Agency § 376 (1958). The evidence defendant offered in support of this counterclaim, viewed most generously to it, portrayed supposed failings which, without exception, fell outside the scope of the agency depicted in the parties' Agreement. Accordingly, that evidence was inadequate to sustain a claim for breach of fiduciary duty. We illustrate the point.

■ K mart complains that FHI failed to acquire particular brand name items (*e.g.*, Levi, Lee, Van Heusen). Yet, the evidence was uncontradicted that FHI tried to obtain these labels and brands earnestly, albeit unsuccessfully. To cite but one example, plaintiff—even after losing a promising contact with Levi—repeatedly attempted to develop other contacts and to *gain access to that label.* The fact that FHI ultimately failed, standing alone, in no way proves that it did not try in good faith to honor K mart's wishes. Nothing in the Agreement or in the law of agency was tantamount to a guarantee of success.

Perhaps more importantly, FHI's obligations under the Agreement are tied with much looser bonds than K mart would have us believe. Notwithstanding a brief laden with ululations imploring that K mart desperately wanted particular labels and brand name items, FHI was not obligated to acquire narrowly defined merchandise requirements. To the contrary, the operative

portion of the contract obligated FHI, broadly, to bring to the retailer "recognized designer and national brand name fashion and fashion-related apparel merchandise." Agreement § 2. K mart's consistent flow of orders, based on samples presented by FHI, constituted irrefutable proof that FHI fulfilled this loosely defined duty. It was not bound, on its own initiative, to conjure up particular labels and brand names, regardless of availability. Indeed, the Agreement's specific definitional exceptions for items like "Jonathan Logan" and "Sasson" amply demonstrate that, when the parties wanted to specify obligations anent specific labels or brand names, they knew how to do so.

■ K mart also complains that FHI breached its duty of loyalty by massive indifference towards the salability, and consequently, the profitability, of the merchandise ordered and supplied. But, the boundaries of plaintiff's fiduciary duty were not so expansive as K mart's theory assumes. As the deal was structured, it was not FHI's responsibility to determine how merchandise would perform once it was in the retailer's hands. Under the Agreement, FHI tendered samples and K mart decided which products to order. Only the latter could actually give the green light for a particular purchase. Choosing which items out of the array would sell well was, therefore, a responsibility which rested with defendant. Hence, even if defendant proved that its buying agent was Laodicean when it came to the principal's bottom line—a matter as to which we take no view—no actionable breach of fiduciary duty would inhere in the circumstances at bar.

■ Nor can K mart base a fiduciary duty claim on allegations that it was, on occasion, overcharged for services and merchandise acquired through plaintiff. For one thing, the evidence was manifestly insufficient to show a pattern of scurrilous pricing. For another, billing disagreements occur, and are to be expected, in virtually any contractual relationship of so prodigious a scale. Without more, the mere existence of garden-variety price disputes between business partners, even

agent and principal, does not present an actionable breach of fiduciary duty. *See Minnesota Farm Bureau Marketing Corp. v. North Dakota Agric. Marketing Assoc.,* 563 F.2d 906, 912–13 (8th Cir.1977). So exotic a claim cannot be hung on so mundane a hook.

■ K mart's last gasp resurrects the Guess? jeans transaction. As recounted above, FHI bought the jeans for its own account, without waiting for K mart to act. It gave K mart the first chance to acquire these jeans. K mart did so, paying FHI the standard 5% commission. The district court found that this transaction could not be the source of a fiduciary duty claim because it was a "straight purchase arrangement," arising out of a separate purchase order, rather than a transaction under the Agreement. We believe the district judge's decision was correct.

The existence of the Agreement is not itself determinative of the proper characterization of every transaction, but is simply one factor to be considered. *See Staco Energy Products Co. v. Driver–Harris Co.,* 578 F.Supp. 700, 702 (S.D.Oh.1983). In the district court, K mart's trial counsel repeatedly characterized FHI as the vendor, not the finder, of the Guess? jeans. We think the evidence permits no other characterization. As the parties operated under the Agreement, each transaction was unitary: an order would be placed by K mart and then executed by FHI. The Guess? transaction, however, was binary: it consisted of two purchases, one by FHI (when it originally bought the jeans), and a second by K mart (when it acquired them). By purchasing this merchandise on its own behalf, FHI decided to forgo the prophylactic assurances which it enjoyed under the Agreement and to bear the risk of loss if it was unable to locate a purchaser at a sufficiently lucrative price. The corresponding benefit, of course, was that plaintiff enjoyed the freedom to sell as and where it pleased, and to cut as advantageous a deal as the traffic would bear. The fact that K mart ultimately purchased the goods from FHI does not negate the inescapable conclusion that, in substance and form, this

**1092**

transaction was a purchase and sale between plaintiff and defendant, accomplished outside the framework of the Agreement.

## E. *Fraud.*

■ Two of defendant's counterclaims were grounded in fraud, one alleging that FHI fraudulently induced K mart to enter the Agreement and the second pertaining to the Guess? jeans. These counterclaims sound in tort, so there is a preliminary choice-of-law question, notwithstanding the parties' contractual preference for Michigan law. In a tort case invoking diversity jurisdiction, a federal district court must apply the forum's choice-of-law principles. *Quaker State*, 884 F.2d at 1514. Rhode Island employs an "interest-weighing" approach to choice of law in tort matters. *Berardi U.S.A., Ltd. v. Employers Mut. Cas. Co.*, 526 A.2d 515, 516 (R.I.1987). Myriad factors are scrutinized to determine which jurisdiction "bears the most significant relationship to the event and the parties." *Pardey v. Boulevard Billiard Club*, 518 A.2d 1349, 1351 (R.I.1986). These factors include, *inter alia:* the place(s) of injury and tortious conduct; the domicile and residence of the parties, and where they do business; the place where the parties' relationship was centered; and considerations of sound judicial policy. *Berardi*, 526 A.2d at 516–17; *see also* Restatement (Second) of the Conflict of Laws §§ 6, 145 (1971).

In this case, the balancing leads to a choice between New York (where the allegedly fraudulent statements were made) and Michigan. We need not draw the threads of inquiry finer: our research reveals no material conflict between New York and Michigan law in terms of resolving the fraud claims. When a choice-of-law question has been reduced to the point where nothing turns on more precise refinement, that should be the end of the matter. *See, e.g., Hart Engineering Co. v. FMC Corp.*, 593 F.Supp. 1471, 1477 n. 5, 1481 (D.R.I.

1984) (when result unaffected, court need not formally make a choice of law).

It is an elementary concept that, to recover for fraud, a claimant must show that the asserted damage was caused by reasonable reliance upon the opposing party's false representations. *See Highland Securities Co. v. Hecht*, 145 A.D.2d 393, 536 N.Y.S.2d 67, 68 (1988); *Hi–Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 247 N.W.2d 813, 816 (1976). Under both New York and Michigan law, each element of a claimed fraud must be proven by clear and convincing evidence.[8] *See Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 971 (2d Cir.1987); *Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 330 N.Y.S.2d 33, 280 N.E.2d 867, 871 (1972); *Hi–Way Motor Co.*, 247 N.W.2d at 816. Given these precepts, we need not linger long over the fraud counterclaims: even granting all reasonable inferences in its favor, K mart failed to provide clear, convincing evidence of detrimental reliance in connection with either of its fraud theories.

■ 1. *Fraud in the Inducement.* The more general of the two claims is anchored less in reason than in wishful thinking. In the district court, K mart alleged that it was induced to enter the Agreement by misrepresentations to the effect that FHI could procure apparel for K mart directly from Levi Strauss & Co. (Levi). K mart admits, however, that it knew beforehand that FHI could not obtain garments directly from Levi. There was a lengthy trial marriage during which K mart learned (and often complained about) FHI's inability to purchase particular labels and brand names directly from certain manufacturers, Levi included. Notwithstanding FHI's repeated failures in this regard, and K mart's knowledge of the facts, defendant still entered into the Agreement.

What is more, the insertion of the agreeing-to-agree proviso, according to K mart, resulted in part from its concern over

---

8. We are obliged to take account of such a substantive evidentiary standard when reviewing the correctness of a directed verdict. *Des-*

*fosses,* 836 F.2d at 30; *see also Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

FHI's apparent inability to gain direct entry to certain sources. Having hawked this notion, K mart cannot now be heard to talk out of the other side of its corporate mouth. On this record, the district court appropriately concluded that defendant had failed in its attempt to show that it entered the Agreement on account of reasonable reliance on FHI's misrepresentations.

■■ 2. *The Guess? Claim.* As to the Guess? matter, the jeans in question were originally labelled "FOR MEN." The evidence showed that FHI had obliterated the "FOR MEN" insignia. The gist of the claimed fraud, then, was K mart's assertion that FHI had represented the pants as being saleable as women's wear. But, K mart conceded that, some months prior to the goods being advertised for sale as women's jeans, K mart employees erased the obliteration, inspected the label on a pair of jeans, and saw the identifying words "FOR MEN." Additionally, K mart personnel took note of the same facts while the jeans were still in FHI's showroom, well before K mart accepted delivery. Detrimental reliance was an element of K mart's claim as to which it bore the burden of proof. We agree with the trial court that defendant's knowledge of the jeans' true character during the period when the Guess? merchandise was being ordered (and months before the jeans were placed on sale by the retailer) snapped the causal chain. This, in turn, foreclosed a subsequent entreaty that K mart reasonably relied on FHI when it steamed ahead with its plan to market the jeans to a female clientele. Given K mart's conversance with the true facts at the time of its purchase, and its failure to prove detrimental reliance, there was no plausible basis for a fraud claim. The directed verdict was proper.

### F. *Indemnification.*

K mart's remaining counterclaims, merged below into a single claim, *see supra* Part IV(A), also arose out of the Guess? transaction. As recounted above, the manufacturer had sued K mart and FHI for trademark infringement. Both settled. By way of these counterclaims, K mart sought indemnification from FHI for what it had paid in settlement ($1,250,000) together with counsel fees and costs incurred in the course of its defense. The district court ruled that K mart was not entitled to indemnification for the "fundamental" reason that "K mart never proved ... by any evidence that [it was] required by law to pay Guess? one red penny." In order to succeed, the judge opined, K mart would have had "to prove all the elements of [Guess?'s] claim...." We think this ruling was erroneous.

The sale of the jeans was effected pursuant to a purchase order, written on a form prepared by FHI. It contained the following indemnity agreement:

> [FHI] agree[s] to indemnify [K mart] and hold [K mart] harmless against any and all liability, loss, claim, suit, judgment and cause of action, or expense, including costs and counsel fees, by reason of any ... trademark ... litigation now existing or hereafter commenced with respect to any or all items covered by this order.[9]

As noted before, the Guess? transaction was structured outside of the Agreement; and the purchase order was devoid of any choice-of-law provision. Thus, the matter of indemnity is not automatically subject to Michigan law.

We once again turn to the conflict principles of the forum. *See Quaker State,* 884 F.2d at 1514. In contract cases, the Rhode Island Supreme Court has specifically declined to decide whether to apply the *lex loci contractu* rule or to adopt the "interest-weighing" approach employed by the court in tort matters. *See A.C. Beals Co. v. Rhode Island Hospital,* 110 R.I. 275, 292 A.2d 865, 871 n. 5 (1972); *see also Everett/Charles Contact Prod. v. Gentec, S.A. R.L.,* 692 F.Supp. 83, 89 (D.R.I.1988). The two obvious sources of applicable state law —indeed, the only sources suggested by the parties—are New York (where the pur-

---

**9.** The clause is written so broadly that neither K mart's lack of success on its other Guess?-related counterclaims, *see supra* Parts IV(D), IV(E)(2), nor its capitulation to Guess? in the infringement litigation, precludes recovery on its claim for indemnification.

chase orders were signed) and Michigan. Inasmuch as our study of the case persuades us that the rules necessary to resolve the indemnification question on appeal are essentially the same under the law of either state, we simply note the dilemma and abjure any effort to resolve the choice-of-law question. *See supra* at p. 1092.

Where, as asserted here, the duty to indemnify arises out of contract instead of as a matter of law, "the question of whether actual liability is a prerequisite to the duty to indemnify is answered by reference to what the parties, by virtue of their contractual capacity, intended, as reflected in the language of the indemnity clause." *Bainville v. Hess Oil V.I. Corp.*, 837 F.2d 128, 131 (3d Cir.1988); *cf. United States v. Seckinger*, 397 U.S. 203, 211, 90 S.Ct. 880, 885, 25 L.Ed.2d 224 (1970) (intent of parties expressed in contractual indemnity provision governs whether indemnitee can recover for own negligence). In this case, the indemnity clause is written in such broad, sweeping language as to make it highly probable that the parties never meant to make *actual*, as opposed to *reasonably perceived*, liability a prerequisite to indemnification. In addition, the record makes manifest that the putative indemnitor, FHI, had notice of the trademark owner's action against K mart, but declined to defend it. In such circumstances, the general rule in both New York and Michigan is that the indemnitor will be bound by any reasonable, good faith settlement the indemnitee might thereafter make. *See Gray Mfg. Co. v. Pathe Industries, Inc.*, 33 A.D.2d 739, 305 N.Y.S.2d 794, 796 (1969) (citing *Feuer v. Menkes Feuer, Inc.*, 8 A.D.2d 294, 187 N.Y.S.2d 116, 121 (1959)), *aff'd*, 26 N.Y.2d 1045, 312 N.Y.S.2d 200, 260 N.E.2d 821 (1970); *Trim v. Clark Equip. Co.*, 87 Mich.

App. 270, 274 N.W.2d 33, 36 (1978). For our purposes, this means that an indemnitee, like K mart, may recover based on its potential liability and need not demonstrate actual liability by proving the elements of the underlying claim against it. *See Feuer*, 187 N.Y.S.2d at 121–22; *Trim*, 274 N.W.2d at 36. In fine, "the indemnitee must show [only] that the fact situation of the original claim is covered by the contract of indemnity and that the settlement is reasonable." *Trim*, 274 N.W.2d at 36; *see also Gray Mfg.*, 305 N.Y.S.2d at 796.

In the instant case, the initial prong of this inquiry is clearcut. The terms of the purchase order, as quoted above, leave little question but that the indemnity clause encompassed the fact situation of the claim which Guess? brought for trademark infringement. As to the second prong, reasonableness, *Trim* (which we believe faithfully mirrors the purport of New York's, as well as Michigan's, law) is instructive:

> The reasonableness of the settlement consists of two components which are interrelated. The fact finder must look at the amount paid in settlement of the claim in light of the risk of exposure. The risk of exposure is the probable amount of a judgment if the original plaintiff were to prevail at trial, balanced against the possibility that the original defendant would have prevailed. If the amount of the settlement is reasonable in light of the fact finder's analysis of these factors, the indemnitee will have cleared this hurdle.

*Trim*, 274 N.W.2d at 36–37 (citations omitted). At trial below, K mart proffered acceptable evidence of reasonableness.[10]

---

10. K mart also offered evidence as to its defense costs (largely attorneys' fees). The district court excluded the proffer of a gross figure, citing the lodestar requirements of federal fee-shifting caselaw. *See, e.g., Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 950 (1st Cir.1984). Yet in a diversity case, unlike a federal question case, "state rather than federal law governs the issue of the awarding of attorney's fees." *Northern Heel Corp. v. Compo Indus., Inc.*, 851 F.2d 456, 475 (1st Cir.1988) (citations omitted). Where, as here, the indemnity contract is broad—covering "any and all ... expense, including costs and counsel fees"—and the indemnitee is prepared to prove that it actually paid the fees "in arm's length dealing," *see Peter Fabrics, Inc. v. S.S. "Hermes"*, 765 F.2d 306, 317 (2d Cir.1985), proof of reasonableness, under whichever state law was applicable here, required far less than the district court demanded. *See generally, e.g., Colon v. Automatic Retailers Assoc. Service, Inc.*, 74 Misc.2d 478, 343 N.Y.S.2d 874, 882 (1972) (citing general factors to be considered in reasonableness determination); *Butt v. Detroit Auto.*

Its evidence was designed to show FHI's near-equal settlement in the same case and the infringement court's determination that K mart's settlement was executed in good faith. Notwithstanding, the district court, apparently motivated by its belief that K mart had to prove all the elements of the manufacturer's claim against it, rejected the proffers. It should not reflexively have done so.

Because the directed verdict was premised on the district court's erroneous view of the law on contractual indemnity and its subsequent rejection of probative evidence bearing on the nature of the Guess? settlement, we are constrained to remand for a proper determination of FHI's liability to indemnify its vendee.

## V. CONCLUSION

### A. *Other Issues.*

Although other issues have been briefed and argued, their status is, in the main, too problematic to justify appellate review. Depending upon what transpires at retrial, we can but guess whether various evidentiary arcana will or will not remain pertinent to the litigation. We are equally cognizant that, even if the same points are pressed anew, their posture may well be materially altered, given our recension of the law applicable to the preclusory order, the Agreement, and the counterclaims. The question of prejudgment interest raised by plaintiff's cross-appeal is likewise speculative; that issue may or may not appertain, contingent upon the retrial's result. Because federal courts are not in the habit of rendering advisory opinions, and should not encourage the practice, we decline to deal with a covey of birds which may never come home to roost.

Notwithstanding this general disclaimer, we do mention in passing two points which defendant has sought to raise:

1. *The Spreadsheet.* The district court overrode K mart's objection and allowed into evidence a spreadsheet prepared by K mart and claimed by it to be privileged. Because the document is little less than damning, the question of its admissibility seems virtually certain to recur. Ordinarily, such a circumstance might impel us to address the issue—but in this case there is a special reason to refrain from doing so.

■ Before the district court, K mart urged that the spreadsheet was inadmissible on federal-law grounds. The court looked to the federal common law, as K mart had hoped, but found the assertion of privilege unavailing. On appeal, K mart sings a radically different tune: it abandons the federal-law argument in favor of an argument that state law governs, *see* Fed.R.Evid. 501 [11]. It contends, for the first time, that Michigan supplies the substantive rule, and that, under Michigan law, the spreadsheet was inadmissible. Under our settled practice, were we to reach the spreadsheet issue today, we would hold K mart to the position it advanced before the trial court and determine the document's admissibility under federal common law. *See, e.g., United States v. Piva,* 870 F.2d 753, 759–60 (1st Cir.1989) (party cannot raise for the first time on appeal basis for objection not specifically raised below); *United States v. Figueroa,* 818 F.2d 1020, 1025 (1st Cir.1987) (similar). But, the need for a retrial gives K mart a reprieve from its seeming procedural default; it will have a fresh opportunity to object and to argue the applicability of Michigan law. Viewed in this light, we believe that the district court, in a live context, should have the first opportunity

*Inter–Insurance Exchange,* 129 Mich.App. 211, 341 N.W.2d 474, 479 (1983) (similar).

**11.** The rule stipulates that federal common law shall govern claims of privilege in federal trials, except that such questions "shall be determined in accordance with State law" in civil trials "with respect to an element of a claim or defense as to which State law supplies the rule of decision...." Fed.R.Evid. 501. We note that:

"The proviso is designed to require the application of State privilege law in civil actions and proceedings governed by *Erie R. Co. v. Tompkins,* 304 U.S. 64 [58 S.Ct. 817, 82 L.Ed. 1188 (1938) ]." *Id.,* reporter's note (quoting House Report 93–650, House Committee on the Judiciary). This diversity case is, of course, within *Erie's* sphere of influence.

to pass upon the appropriateness of using state law and the validity of defendant's objection thereunder.

2. *The Judge's Conduct.* K mart launches a no-holds-barred attack on the trial judge's demeanor and fairness, and on the way in which the trial was conducted.[12] As a practical matter, the point is moot: under the applicable local rules, our remand of the case for retrial will result in its reassignment to a new trier. *See* D.R.I. L.R. 7(g) ("When an appellate court remands a case to [the federal district court in Rhode Island] for a new trial, the case shall be reassigned to a judge other than the judge before whom the first trial was held."). Nevertheless, we take seriously our supervisory responsibilities; we expect counsel who appear before us to take their obligations equally as seriously, and to refrain from casting unwarranted aspersions. When a party loses calamitously, it may seem an easy excuse to blame the judge and impugn his fairness—but this court is not prone to swallow sour grapes whole, without concrete evidence of spoliation. We have no intention of "making the hurling of epithets a rewarding sport for litigants." *Camacho v. Autoridad de Telefonos*, 868 F.2d 482, 491 (1st Cir.1989).

In this case, we find K mart's personalized attack upon the trial judge to be completely unfounded. Having closely examined the massive record of this protracted trial, we can discern no basis for the claim of unfairness. The challenged comments, for the most part, were tame, well within the give-and-take of a long, arduous trial. To the extent that the judge, on occasion, displayed a touch of sarcasm, impatience, or ire, he seems to have been given ample cause. To be sure, in this as in virtually any other trial, it is possible to argue that some isolated thing could have been handled differently, or perhaps more diplomatically. There might have been, from time to time, a momentary lapse—but, especially in a case as acrimonious as this one proved to be, "appellate courts must grant the presid-

er some margin of humanity." *United States v. Polito*, 856 F.2d 414, 418 (1st Cir.1988).

All in all, viewing the record as a whole, there can be no reasonable doubt but that the trial judge performed creditably in an enormously difficult case. K mart received the evenhanded, impartial trial that it had a right to expect. *See id.* (noting that "litigants are entitled to a fair trial, but not necessarily a perfect or a monochromatic one").

### B. *Summing Up.*

To recapitulate, we rule that the district court's preclusory order was a valid exercise of its powers, the circumstances considered, and may remain in effect. The district court erred, however, in its construction of the Agreement and in directing a verdict on the merged counterclaims for indemnification. There must be a retrial on the complaint and the matter of indemnity, but the entry of directed verdicts on the remaining counterclaims should not be disturbed. Lastly, we find no evidence that the trial judge was less than scrupulously fair.

We need go no further. We specifically eschew rendering any decision on, or expressing any opinion about, a variety of other issues which the parties seek to raise on appeal. *See supra* Part V(A).

*In No. 89–1330, the judgment is reversed in part, affirmed in part, and vacated. The cause is remanded for a new trial in accordance herewith.*

*In No. 89–1331, the appeal, having become moot, is dismissed without prejudice.*

Each party shall bear its own costs.

### APPENDIX

### Excerpts from "Buying Agency Agreement"

#### 1. BUYING AGENCY

1.1 Fashion House and K mart agree that Fashion House will act as a buying agent

---

**12.** Defendant tells us, for example, that the trial court's "remarks before the jury ... were ... [so] injudicious [as to have] poisoned the case." Opening Brief at 54. Defendant likewise accus-

es the court of having prejudged the case's equities. *See id.* at 30; *see also* Reply Brief at 38 n. 47.

pursuant to the terms hereof. Fashion House agrees that in its capacity as buying agent it will acquire (or cause to be acquired) from manufacturers for K mart and its Affiliates such Merchandise as is ordered by K mart or any of its Affiliates through Fashion House under and during the term of this Agreement; and K mart agrees that pursuant to the terms hereof it will purchase (or cause to be purchased) any such Merchandise.

\*　　\*　　\*

## 2. MERCHANDISE

"Merchandise" shall mean men's, women's, boys', girls', infants' and toddlers' recognized designer and national brand name fashion and fashion-related apparel merchandise; but not (a) products with names or labels owned or used by or licensed or exclusive to K mart or any of its Affiliates including products such as "Jonathan Logan" and "Esquire" and (b) products with names or labels originated by or for K mart or any of its Affiliates. The parties recognize that the definition of Merchandise is, of necessity, imprecise. Therefore, as may be required from time to time, whether particular products are included in or excluded from the definition of Merchandise shall be determined by mutual agreement between Fashion House and K mart.

## 3. REQUIREMENTS

3.1　K mart agrees that it will order (or cause to be ordered) through Fashion House at least 85% (based on dollar volume at cost) of Requirements. "Requirements" shall mean Merchandise requirements for resale during the term of this Agreement in stores operated by K mart and its Subsidiaries in the United States, provided, however, that it shall not include (i) stores, departments or merchandise lines which are not within the current operations of K mart and its presently-existing Subsidiaries, (ii) "Wrangler" and "Sasson" products, and (iii) Merchandise for which orders or commitments were given by K mart or any of its Subsidiaries to third parties prior to the date hereof. The determination of Requirements shall be made by K mart in

good faith; in this regard, there shall be no maximum or minimum quantity of Requirement and no restrictions on merchandising decisions by K mart or its Subsidiaries which may increase or decrease Requirements.

3.2　The obligation to order at least 85% of future Requirements through Fashion House shall be satisfied if as to each fiscal year of K mart during the term of this Agreement, the total dollar volume of Merchandise orders placed, or deliveries scheduled on orders placed, through Fashion House under this Agreement during such period represents at least 85% of the dollar volume of Merchandise orders placed or deliveries scheduled through all sources (direct and indirect) for Requirements during the period. . . .

## 4. ORDERS

4.1　Fashion House will acquire Merchandise ordered hereunder only pursuant to authorization from and on terms approved by K mart in writing, including the form of purchasing documents to be used by Fashion House. Fashion House will not agree to or acquiesce in any contrary terms without K mart's prior written consent. Orders placed through Fashion House hereunder by K mart and its Affiliates will be based on samples from Fashion House, or as otherwise mutually agreed between the parties, and within guidelines mutually agreed between the parties.

\*　　\*　　\*

## 5. PAYMENTS AND COMMISSIONS

5.1　K mart will pay or reimburse (or cause to be paid or reimbursed) the purchase price from the manufacturer of Merchandise ordered and received hereunder by K mart or any of its Affiliates and transportation and insurance costs, if any, not included in the price. . . .

5.2　Payment and financing arrangements with appropriate K mart controls will be established as mutually agreed between K mart and Fashion House as necessary so as to permit Fashion House to order Merchandise hereunder and so as to permit timely payment to vendors. . . .

5.3 K mart will pay (or cause to be paid) to Fashion House for its services hereunder a commission of 5% of the net cost price of any Merchandise purchased by K mart and its Affiliates through Fashion House and received by them in good order....

6. ASSISTANCE

6.1 During the term of this Agreement, Fashion House will provide and will cause its employees to provide assistance and advice to K mart and its Subsidiaries, if and to the extent requested by them, with respect to stores operated or to be operated by K mart or its Subsidiaries (whether 'K mart', 'Kresge', 'Designer Depot' or other stores) which will sell Merchandise. Such assistance and advice will be provided exclusively to K mart and its Subsidiaries and will include, but not be limited to, methods of purchasing merchandise, store site selection, merchandise and fixture layout and store operation.

\* \* \*

7. TERM

7.1 The initial term of this Agreement shall commence as of the date hereof [June 30, 1983] and continue until November 1, 1987; thereafter it shall be renewable annually by K mart at its option for one-year periods up to ten additional years....

\* \* \*

9. CONDITIONS

K mart's obligations under this Agreement ... are specifically conditioned on (i) Fashion House's ability on a continuing basis to acquire Merchandise ordered hereunder and to acquire Merchandise at competitive prices, terms and quality as determined on a reasonable basis by K mart, ... and the due performance of and compliance with the terms and covenants of this Agreement....

\* \* \*

11. GENERAL

\* \* \*

11.4 K mart and/or its designated representatives shall have reasonable access to the books, records, tax returns and other material documents of Fashion House. Fashion House and/or its designated representatives shall have reasonable access to the books and records of K mart for the purpose of determining that K mart has fulfilled its obligations under Section 3 hereof.

11.5 This Agreement supersedes any prior agreement between the parties with respect to the subject matter hereof.

11.6 This Agreement may be altered, amended or supplemented only by a writing signed by the parties.

11.7 This Agreement shall be construed in accordance with and be governed by the laws of the State of Michigan....