December 14, 1993 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2473
No. 93-1801

CAROL GAGNE FUSCO,

Plaintiff, Appellee,

v.

GENERAL MOTORS CORPORATION,

Defendant, Appellant.

ERRATA SHEET

The opinion of this Court issued on December 6, 1993, is
amended as follows:

On page 4, line 1 of first full paragraph, replace "General
Motors'" with "General Motors".

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2473
No. 93-1801

CAROL GAGNE FUSCO,

Plaintiff, Appellee,

v.

GENERAL MOTORS CORPORATION,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Martin F. Loughlin, Senior U.S. District Judge]

Before

Boudin, Circuit Judge,

Coffin and Campbell, Senior Circuit Judges.

Thomas J. Sweeney with whom Howard B. Myers, Terrence E. Haggerty

and Bowman and Brooke were on brief for appellant.

Robert K. Mekeel with whom Law Offices of Joseph F. McDowell,

III, P.A., William J. Murphy, Robert T. Shaffer, III and Murphy &

Shaffer were on brief for appellee.

December 6, 1993

BOUDIN, Circuit Judge. Carol Fusco was injured in a car

accident and brought suit against General Motors, the car's

manufacturer. A jury awarded Fusco $1 million in damages and

General Motors has appealed, challenging rulings on evidence

and discovery made by the district judge. We affirm.

I.

On December 15, 1986, Fusco was driving her car, a

Chevrolet Chevette, near Pelham, New Hampshire. Her car

suddenly left the roadway, slid across an ice-covered

embankment, and hit a telephone pole somewhere along the

front left side of the car. Fusco was injured.

Fusco brought suit against General Motors in state court

in New Hampshire, claiming that a key component in the

steering system--the front left "ball stud"--had broken from

metal fatigue and caused the disaster.1 General Motors

removed the case to federal district court and took the

position that the ball stud had not been the cause of the

accident but rather had fractured when the car hit the

telephone pole. A jury trial, begun on July 7, 1992,

resulted in an evenly divided hung jury, and the district

court promptly ordered a second trial for November 16, 1992.

1It appears that the ball is a spherical object with a
protruding stud; that the ball and stud together form part of
the elaborate connection (via the tie rod and steering gear)
between the tire wheel or axle and the steering wheel. If
the stud breaks entirely, the tire wheel is no longer
controlled by the steering wheel.

-2-

At the second trial Fusco offered eyewitness testimony

that her car had abruptly veered off the highway and collided

with a telephone pole. A state trooper who arrived first at

the accident testified that the car was resting against the

pole near the hinge pillar on the driver's side, a location

between the door and the left front fender. Fusco offered

two experts (Robert Walson and Carl Thelin) who, based in

part on this testimony and their examination of the broken

ball stud, concluded that metal fatigue had caused the stud

to break, causing the steering apparatus to fail and the car

to veer into the pole.

Walson, a metallurgist, testified that the surface of

the broken ball stud taken from Fusco's car was

characteristic of a fatigue, rather than an impact, fracture.

He supported his opinion in several ways including his

pretrial examination of the surface of the ball stud under a

scanning electron microscope; he was fiercely cross-examined

by General Motors about this examination. Thelin, an

automotive engineer, testified that General Motors' design

and quality control of the ball stud were inadequate. Based

on partial reconstruction of the accident, he also challenged

General Motors' argument that the telephone pole impact could

have broken the ball stud.

General Motors' case included testimony from its expert

Jerry Chiddister who reconstructed the accident based on his

-3-

experience with many crash tests. In his view, the car had

"sideslipped" into the telephone pole, causing the car to

slide along the pole starting at the front left fender and

ending with the pole lying next to the door hinge column. He

opined that on its travel down the side of the car, the pole

hit the front left tire and the impact broke the ball stud, a

predictable occurrence given the estimated speed of the car.

Had the stud broken before the car veered, Chiddister said

that there would have been a heavy black tire mark on the

road because the uncontrolled tire would have dragged as the

car slid off course.

Kirk Ulman, another General Motors expert, testified

that he had examined the ball stud itself. He explained why

the location of the break (at the neck of the stud), the

surface of the break (grainy with chevron marks), and other

characteristics meant that impact and not fatigue was the

cause. James Willis, who worked in General Motors' facility

that made the steering gear, testified to quality control and

the nature of simulated fatigue fractures. Ray Schultz, a

metallurgist, confirmed Ulman's testimony on key points.

The jury rendered a verdict in favor of Fusco and

awarded her $1 million in damages. General Motors then

appealed. In its brief General Motors does not challenge the

sufficiency of Fusco's evidence but confines itself to

contesting several evidentiary and discovery rulings, rulings

-4-

that can only be understood against the backdrop of the

testimony already described. Although these claims of error

are not frivolous, we do not think that any of them warrants

further proceedings.

II.

General Motors' first claim on appeal is that the

district court erred in ruling, prior to the first trial,

that two videotapes--the "driving tapes"--were inadmissible.

The main tape made in 1992 has two parts. In the indoor

part, Ulman used a car mounted on a lift to display the

function of the ball stud and tie rod and showed how in this

demonstration the connection between the stud and the tire

wheel or axle had been altered in the test vehicle so that

the stud could be released deliberately from inside the car.

In the outdoor part, filmed at a General Motors test

track, Ulman drove the Chevette while Willis, sitting in the

passenger seat, intentionally disconnected the tie rod from

the tire wheel. The film showed that, when the left wheel

finally separated from the rod, the wheel flopped out of

alignment with the right wheel and dragged on the highway

apparently creating a long black skid mark. The car did not

veer out of control or hit the track barrier. The other

tape, made in 1986, simply showed a similar test track

demonstration with a different driver and passenger. Thus,

-5-

there is no need for an independent discussion of this tape.

When General Motors produced the tapes to Fusco in June

1992, shortly before the first trial, Fusco made a motion in

limine to exclude them, arguing that the test track

conditions did not duplicate the conditions that existed at

the time of the actual accident. In an oral ruling on July

8, 1992, the trial judge granted the motion. Although

General Motors argues that the exclusion of the tapes was

error, it did not seek to offer the tapes at the second

trial.

Seizing on this omission, Fusco argues that General

Motors has waived its right to argue that the exclusion was

error. Fusco points to cases holding that an in limine

ruling on evidence may not be reviewed on appeal unless the

offer or objection is renewed when evidence is actually

presented at trial. This court has made general statements

to this effect, e.g., United States v. Reed, 977 F.2d 14, 17

(1st Cir. 1992), in cases where the in limine motion to

exclude was denied and the opponent of the evidence failed to

renew the objection at trial. We have found no case in this

circuit, however, where an in limine motion to exclude was

granted and the proponent of the evidence, by failing to

renew the offer at trial, was found to have waived the issue.

-6-

Where an objection to evidence has been overruled in

limine, it makes sense to require that the objection be

renewed at trial. However definite the denial of the motion

to exclude prior to trial, it is child's play for the

opponent of the evidence to renew the objection when the

evidence is actually offered; and requiring this renewal

gives the trial judge a chance to reconsider the ruling with

the concrete evidence presented in the actual context of the

trial. The only criticism one might offer of the requirement

is that the Federal Rules of Evidence say nothing about a

second objection,2 but any practiced trial lawyer knows that

much of the law of evidence is not contained in these written

rules.

On the other hand, where the motion in limine is

granted, and the proponent of the evidence is told that the

evidence will not be admitted, the situation is different.

To require that the evidence be offered again at trial would

certainly give the trial court a second chance, but doing so

can hardly be described as easy: on the contrary, the

proponent would have to engage in the wasteful and

inconvenient task of summoning witnesses or organizing

2The Federal Rules of Evidence do not address in limine

motions at all. Instead the rules require in general terms
that, to preserve a ruling on evidence for appeal, the
proponent of evidence make its substance known to the court
and an opponent make known the objection to the evidence and
the ground of the objection. Fed. R. Evid. 103(a).

-7-

demonstrative evidence that the proponent has already been

told not to offer. Indeed, in many cases the prior grant of

the in limine motion would make it improper to call such

witnesses without prior permission. All the proponent could

do would be to line up the witnesses at trial and then ask

permission.

Although a symmetrical rule may be preferable if all

else is equal, all else is not equal here. Where a court

rules in limine that certain evidence is excluded but the

ruling is merely tentative or qualified, then the proponent

might well have to offer the evidence at trial in order to

preserve an appeal on the issue. Fed. R. Evid. 103(a). But

where the pretrial proffer is adequate and evidence is

excluded unconditionally by a pretrial order, then we think

that the proponent has preserved the issue for appeal and

(other circumstances being unchanged) need not bring the

witness to court and proffer the evidence again at trial.

See McQuaig v. McCoy, 806 F.2d 1298, 1301-02 (5th Cir.

1987).3 The result is the same here where the in limine

3Preserving the claim of error based on exclusion of
evidence requires an adequate proffer, so that the trial and
appellate courts know what evidence is at issue. Fed. R.
Evid. 103(a). There may also be cases where a change in
circum-stances, after the in limine ruling but before trial,

might make it unreasonable for the proponent to rely on the
solely in limine ruling to preserve the issue (a new basis

for admissibility might arise or the court's initial reason
for exclusion might be mooted).

-8-

order preceded the first trial because no one disputes that

the same order governed the second trial.

Needless to say, most district judges are very cautious

about making a definitive ruling in limine that evidence will

not be received at trial. Trial judges know better than most

that many issues are best resolved in context and only when

finally necessary. But here, as happens from time to time,

the trial judge did rule definitively that the evidence would

not be admitted. The proffer was adequate since the tapes

were apparently available to the court. And no change in

circumstances occurred after the in limine ruling that might

have affected the controlling ground for exclusion or cast

any doubt on the trial judge's intention to abide by the

original ruling.

Thus we turn to the merits of the ruling excluding the

driving tapes. The oral ruling was terse ("You don't have to

argue it. I'm not going to let it in.") but the district

judge had a written motion from Fusco, and a written response

from General Motors, and made the ruling only after allowing

both sides to argue their points orally. Fusco's main

objection was that the taped scene on the test track did not

adequately replicate the conditions of the accident. Merely

to state the obvious, no one claimed that the accident had

occurred when a jury-rigged cotter pin was pulled from the

ball stud by a wire leading into the passenger seat. Another

-9-

facially obvious difference is that the test car was driven

by an experienced driver who expected the break to occur.

General Motors readily admitted that the conditions were

not the same but argued that the tape was admissible to show

general scientific principles and that the dissimilarities

went to weight and not admissibility.4 It repeats this

argument on appeal, adding that under Fed. R. Evid. 403 the

burden was upon Fusco (as the opponent of the evidence) to

show that prejudice substantially outweighed probative value.

General Motors says that not only did Fusco fail to show that

the dissimilarities were important but, in addition, General

Motors' own experts would have said that the dissimilarities

were not significant.

The problems raised by demonstrations of this kind are

interesting and important. The test track replication shown

on the driving tapes (this court was furnished with copies of

the tapes) is vivid and pertinent: one sees, in a way that no

words could capture, the tire wheel flip out of alignment and

the tire then dragging on the track. The impression left is

that such an accident would leave a tire streak, as claimed

4General Motors does not claim that the indoor portion
of the tape was admissible independently; and indeed most of
the indoor portion was merely to lay the groundwork for the
test. The indoor portion did show Ulman using a straw, in
place of the stud, to show how the stud could be bent by an
impact on the rear portion of the wheel, but General Motors
does not claim that this brief sequence justified the tape,
and it could easily have been replicated in court with a
mock-up.

-10-

by General Motors, and that the car is more likely to flop

and drag than to veer sharply off the road. A lay juror,

asked whether a look at the tapes would be helpful, would

likely answer yes.

The case law in this area is muddled, as one might

expect, but the tendency of the court is to treat this class

of demonstrative evidence more skeptically than would the lay

juror. The concern lies not with use of tape or film (the

issue would be largely the same if the jurors were taken to

the test track for a live demonstration) but with the

deliberate recreation of an event under staged conditions.

Where that recreation could easily seem to resemble the

actual occurrence, courts have feared that the jurors may be

misled because they do not fully appreciate how variations in

the surrounding conditions, as between the original

occurrence and the staged event, can alter the outcome.

In such cases the solution of many courts, including

this one, has been to call for substantial similarity in

conditions, or to stress the great discretion of the trial

judge to exclude the evidence where similarity is not shown,

or both. E.g.. Swajian v. General Motors, 916 F.2d 31 (1st

Cir. 1990); see 1 J. Strong, McCormick on Evidence 202

(1992) (collecting cases, a number of which involve General

Motors). This case law largely undercuts General Motors'

claim that the burden lay with Fusco to show undue prejudice;

-11-

instead, courts have created a doctrine, predating and now

loosely appended to Rule 403, that requires a foundational

showing of substantial similarity in circumstances. Cf.

Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S. Ct. 2786

(1993) (reliability requirement for expert testimony held

implicit in Rule 702).

Of course the concept of substantial similarity is a

flexible one, and ought to be, for the benefits of the

demonstration and the dangers of misleading the jury will

vary greatly depending upon the facts. We think that the

trial judge enjoys great discretion in this area. But here

the circumstances were not similar: as in Swajian, the test

occurred in controlled conditions, on a test track with a

driver expecting the occurrence, and with a doctored piece of

equipment rather than one that actually broke. 916 F.2d at

36. General Motors does not seriously claim substantial

similarity, despite its reference to the testimony its

experts would have given.

Instead, General Motors says that the tapes here were

designed not to recreate the accident but rather to

illustrate general "scientific principles," presumably the

behavior of a car with a disconnected ball stud. Admittedly,

"[w]hen this [scientific principles] label is attached,"

courts often do ask not about similarity of conditions but

only whether the test was properly conducted. McCormick,

-12-

supra, at 866. We think it would be a great stretch to call

the tapes an abstract demonstration of scientific principles,

but the critical point is not one of labels. The issue for

us is whether the demonstration is sufficiently close in

appearance to the original accident to create the risk of

misunderstanding by the jury, for it is that risk that gives

rise to the special requirement to show similar conditions.5

Here the test track demonstration was rife with the risk

of misunderstanding. Whatever Fusco's counsel or experts

said to the jury about differing circumstances, the drama of

the filmed recreation could easily overcome the logic of the

distinctions. Our case is scarcely different than the

recreation in Swajian involving a broken rear axle in a

similarly staged demonstration by General Motors. We there

affirmed the trial judge's exclusion of such evidence,

pointing to "the sound and broad discretion of the trial

judge" in policing such videotaped evidence. Id. at 36. We

reaffirm here the principle and the result.

III.

The second issue on appeal concerns the decision of the

trial judge to exclude an additional videotape prepared by

5Scientific principles, when demonstrated in a fairly
abstract way, are quite unlikely to be confused with the
events on trial. The more troublesome cases, however, are
ones like this one where some principles of some kind may be
demonstrated but in a fashion that looks very much like a
recreation of the event that gave rise to the trial.

-13-

General Motors after the first trial ended in a hung jury.

This tape was prepared on October 2, 1993, and provided to

Fusco on October 14, 1993, approximately three months after

the first trial and one month before the second. The tape

shows a slow motion, close-up impact fracture of a ball stud

filmed at close range. On the tape one sees the stud bend

and separate from the ball. There is no commentary.

After receiving the tape, Fusco immediately moved in

limine to exclude it, together with a newly created "survey"

of the accident site that General Motors had tendered. The

district court allowed the survey to be used but ruled that

the tape would not be admissible, stating:

With regard to the importance of the
exhibit to the defendant, the Court
cannot fathom how defendant could not
present a complete case to the jury
without the videotape as defendant has
already done so at the first trial.
Finally, the Court does not doubt that
plaintiff would have a difficult time to
formulate a proper response given the
obvious lack of time before retrial. It
is primarily for this reason the Court
obviates defendant from submitting the
videotape exhibit.

On appeal, General Motors does not spend much time

explaining the significance of the tape, saying only that it

was "to show how the part in question bends prior to and

during an overload situation." Instead, General Motors

argues with some force that the district judge has no general

authority to exclude exhibits merely because their last

-14-

minute appearance will inconvenience or burden the other

side. This exclusion, says General Motors, was not an

exercise of the court's accustomed power over discovery but

an interference with the right of counsel to offer evidence

at trial.

Of course, a trial court could readily exclude a witness

or exhibit if some previous order had set a deadline for

identification and the proponent had without adequate excuse

failed to list the witness or exhibit. But here the deadline

for listing exhibits at the second trial did not expire until

one week before trial, well after the tape was tendered. Nor

is there any general rule prohibiting a party from offering

new evidence at a second trial, although few cases address

the issue. See Lauritzen v. Atlantic Greyhound Corp., 8

F.R.D. 237, 238 (E.D. Tenn. 1948), aff'd 182 F.2d. 840 (6th

Cir. 1950). In fact, the district court here allowed General

Motors to introduce at the second trial a newly created

survey of the accident site.

Nevertheless, we think that the tape did implicate the

district court's authority over discovery. The tape was not

a stand alone exhibit: it made sense only in the context of

expert testimony to be offered by General Motors. An expert

or experts would have had to explain the tape's meaning and

would have used it to bolster inferences drawn by the expert.

Indeed, even now it is not clear to us precisely how the tape

-15-

was expected to help General Motors' experts, although we

will assume that it was either intended to counter

plaintiffs' expert analysis or to make more plausible General

Motors' account of how the ball stud retrieved from the

accident was actually damaged.

The connection of the tape to discovery now comes into

view. Fusco's discovery had included a request for

production of "[a]ny and all . . . videotapes" taken by, for

or for the benefit of Ulman, Willis, and "any and all expert

consultants." If the tape had existed when General Motors

first responded to this request, the tape would have had to

be produced. We think that the duty of supplementation

specified in Fed. R. Civ. P. 26(e) also required General

Motors seasonably to produce any later developed videotape of

any importance intended for use by its expert at trial.

The "duty to supplement" provisions are not as clear as

they might be, and the authorities are surprisingly sparse.

A party is required to supplement--that is, update--prior

responses only in limited instances but they include,

pertinently, responses (1) concerning "the substance" of the

expert's testimony and (2) where new information exists and

failure to amend would comprise "a knowing concealment."

Fed. R. Civ. P. 26(e)(1), (2). We have read Rule 26(e)

generously, in light of its dual purposes, the "narrowing of

-16-

issues and elimination of surprise." Johnson v. H.K.

Webster, Inc. 775 F.2d 1, 7 (1st Cir. 1985).6

We think that these clauses are broad enough to

embrace the tape in this case. It was closely connected to

the expert's testimony, it was not previously known to Fusco,

and General Motors can hardly describe the tape as

unimportant since it claims that the exclusion of the tape

undermined the entire trial. Thus we think that the tape was

covered by General Motors' obligation to produce under the

discovery rules. In our view--and this is the final step in

our reasoning--the discovery obligation carries with it the

implicit authority of the district court to exclude such

materials when not timely produced even if there was no rigid

deadline for production.

There is no suggestion that General Motors delayed

unduly if one counts only the brief delay between the

creation of the tape and its tender to Fusco. But practical

considerations suggest that the authority of the trial judge

must be broader: otherwise it would count as adequate

supplementation to create a critical new expert exhibit a day

before trial and tender it on the morning of trial. It is

6The knowing-concealment clause does not require
fraudulent intent; rather it is designed to protect a party
who reasonably believes "that the change that has made an
answer no longer accurate is known to his opponent or that it
is a matter of no importance." Fortino v. Quasar Co., 950

F.2d 389, 396 (7th Cir. 1991).

-17-

common experience that experts, like lawyers themselves, may

increase their efforts as trial approaches, and we do not

suggest any general bar to an exhibit created in good faith

for the expert after initial discovery. But we do think that

where a discovery request for the expert's materials has been

made, the later attempt to add new exhibits designed for the

expert's use at trial is subject to reasonable supervision by

the trial judge.

This circuit adopted this very principle in Thibeault v.

Square D Co., 960 F.2d 239, 245 (1st Cir. 1992). The factual

differences between that case and this one relate to the

sound exercise of the authority to exclude and not its

existence. We emphasize that our ruling in Thibeault and in

this case rests on the existence of a specific discovery

request and the explicit duty to supplement it in timely

fashion. Absent some such obligation, we agree with General

Motors that courts cannot ordinarily tell counsel not to

offer evidence just because the other side will be surprised

and disadvantaged. Once the court's authority to

exclude here is conceded, its exercise in this case cannot be

faulted. The impact tape was a technical experiment made

known to Fusco barely a month before trial. To prepare for

cross-examination might have required further discovery by

Fusco of one or more of the defense witnesses, as well as

additional preparation by Fusco's experts. The tape itself

-18-

is pictures without words; even to determine the precise use

General Motors planned to make of it would have required more

information. The district court was entitled to find that

the tape would have compromised Fusco's pretrial preparations

and that the supplementation came too late to be

"seasonable."

IV.

General Motors' remaining claim of error also relates to

the district court's authority over discovery. At the first

trial Fusco's experts made use of the broken ball stud

recovered from Fusco's car and offered Walson's testimony

based on his examination of the part under a scanning

electron microscope. That part, in Fusco's possession, was

available to General Motors prior to the first trial but it

chose not to make such an examination of its own. In theory,

study of the surface of the broken part might cast light on

whether the part had broken from impact or fatigue.

Taking note of Walson's testimony in the first trial,

General Motors in preparation for the second trial requested

that the part, and an additional Pontiac ball stud used by

Walson for comparison, be made available to it. General

Motors wanted its own metallurgist to make a similar, non-

destructive examination by scanning electron microscope.7

7General Motors proposed to have one of its first-trial
experts conduct the examination but, when Fusco questioned
his qualifications, General Motors proposed to have another

-19-

Fusco refused to produce the parts and General Motors moved

to compel production. The district court wrote a ten-page

order denying General Motors' motion.

In its order, the court said that General Motors knew as

early as May 1991 that Fusco intended to offer evidence of

examination by scanning electron microscope. The court also

said that the new examination was intended as the predicate

for new expert testimony by General Motors, testimony unknown

to Fusco when General Motors' experts were deposed, and that

this last minute addition imposed an unfair burden on Fusco

on the eve of the second trial. The court also referred to

General Motors' development of new evidence on the eve of the

first trial, which the court had permitted over protest by

Fusco. Finally, it expressed concern that General Motors

sought to overwhelm plaintiff with its unlimited legal and

financial resources.

There is no doubt here of the district court's authority

to deny further discovery. As noted above, no automatic bar

exists against new evidence at a second trial; but the

discovery deadline had long since passed and the district

court had no automatic obligation to reopen the discovery

period. E.g., Dabney v. Montgomery Ward & Co., 761 F.2d 494,

expert whose qualifications were conceded participate in the
examination and testify at trial. Whether one views the
testimony as that of a first-trial expert or a new expert
does not greatly affect the matter.

-20-

498 (8th Cir.), cert. denied, 474 U.S. 904 (1985). The

matter was one for the informed discretion of the trial

judge, and the breadth of that discretion in managing pre-

trial mechanics and discovery is very great. E.g., Fashion

House, Inc. v. K Mart Corp., 892 F.2d 1076, 1082 (1st Cir.

1989); Mack v. Great Atlantic & Pacific Tea Co., 871 F.2d

179, 186-87 (1st Cir. 1989). Measured against this standard

of review, the district court's quite thorough explanation

for denying production easily passes muster.

Our own review of the record does not suggest to us that

General Motors' request was made in bad faith or reflected

any attempt to abuse its financial power. Fusco after all

was seeking $8 million, and defense counsel apparently

perceived in the first trial that the testimony by Fusco's

expert about the scanning electron microscope carried some

weight. But it was primarily for the trial judge to balance

the factors, such as the timing of the request, General

Motors' earlier knowledge, the possible burden on Fusco of

preparing to confront a new expert, and the importance of the

testimony. The balance struck here by the trial judge was

not an abuse of discretion.

Affirmed.

-21-